STATE of Missouri, Respondent,

v.

Allen L. NICKLASSON, Appellant.

No. 79163.

Supreme Court of Missouri,
En Banc.

Feb. 24, 1998.

As Modified on Denial of Rehearing
March 24, 1998.

John Bailey, Mesa, Ariz., Patrick J. Berrigan, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Judge.

Allen Nicklasson took Richard Drummond, a Good Samaritan who had given Nicklasson and his friends a lift when their car broke down, to a secluded spot, told Drummond to kneel, suggested that he say his prayers and shot Drummond twice in the head at point-blank range with a pistol. A jury convicted Nicklasson of first degree murder. The jury also recommended the death sentence, which the trial court imposed. Nicklasson appeals. We have jurisdiction. Mo. CONST. ART. V, SEC. 3. The judgment is affirmed.

**I.**

This is a companion case to *State v. Skillicorn*, 944 S.W.2d 877 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997).

August 23, 1994, Allen Nicklasson, Dennis Skillicorn and Tim DeGraffenreid decided to return to Kansas City after a trip east along Interstate 70 to obtain drugs. They drove a 1983 Chevrolet Caprice. It broke down near the westbound Danville exit on I–70. Sergeant Ahern and Trooper Morrison of the Missouri State Highway Patrol came upon the disabled auto, helped push the car to the side of the road and left the men. The troopers last saw the trio as they walked toward a pay phone.

By the next morning, August 24, 1994, Nicklasson, Skillicorn and Degraffenreid and their car had made 17 miles' progress further west. Near Kingdom City the Caprice broke down again. In an effort to find jumper cables, the three approached a Missouri Highway and Transportation Department employee working in the median of the interstate. He could not assist them. They spotted Merlin Smith's nearby home, decided to burglarize it, and took four guns, ammunition, a skinning knife, money, a pillow case, some change and a cracker box. They stashed most of the stolen property in the bushes, then called for a tow truck to take their car to Roger Redmond's garage. Redmond's mechanic found major problems with the car but was able to restart it. The men paid Redmond with a cracker box full of change and left in the car.

Nicklasson and his cohorts decided to try and make it back to Kansas City in their ailing vehicle. First, however, the three men coaxed the car back toward Smith's house to recover the stolen goods they had previously hidden in the bushes alongside the road. The car gave out again, this time on the south outer road, east of Kingdom City.

Between 4:00 and 5:00 p.m., Richard Drummond saw the stranded Nicklasson, Skillicorn and Degraffenreid, stopped, and offered to take them to a telephone. They accepted. Drummond drove a white, 1994 Dodge Intrepid that belonged to AT & T, his employer. Nicklasson told Drummond to back up the Intrepid to the Caprice. Nicklasson and his friends loaded the stolen property from Smith's home into the trunk of Drummond's car, keeping a .22 caliber handgun and a shotgun with them when they got into Drummond's car. Nicklasson and Skillicorn sat in the back seat. Degraffenried sat in the front, passenger seat.

When Drummond took his place in the driver's seat, Nicklasson put the pistol to the back of Drummond's head and said, "You're going to take us to where we want to go." Nicklasson and his pals wanted to go back toward Kansas City. Along the way, they decided to kill Drummond. East of Higginsville, they told Drummond to take the Highway T exit. Four miles north of the interstate they turned onto County Road 202. Finding a secluded area, Nicklasson ordered Drummond to stop the car. Skillicorn took Drummond's wallet. Nicklasson walked Drummond into the woods, ordered Drummond to kneel, told him to say his prayers, and shot him in the head twice. Drummond's badly decomposed body was found and identified eight days later.

Nicklasson, Skillicorn and Degraffenreid continued west on I–70 in Drummond's car. They stopped at Joe Snell's house in Blue Springs. Kelly McEntee, who had dated Degraffenried, came to Snell's house, looking for Degraffenreid. She knocked on the door. Nicklasson answered, then came outside and

said, "Don't nobody touch my car," referring to Drummond's car. With that Nicklasson went to the trunk of the Intrepid and removed a shotgun to assist him in assuring those watching that he did not want them to touch the car. He put the shotgun to McEntee's head and announced that he would kill her. He did not kill her, apparently satisfied that he had made his point after he hit her in the face.

Sometime later, Nicklasson, Degraffenried and Skillicorn left Snell's and went to Annie Wyatt's house. Nicklasson told Wyatt that he had killed someone in the woods and described the murder. After a planning session at a local restaurant, Nicklasson and Skillicorn decided to drive to Arizona. Degraffenreid stayed behind. Authorities arrested the two in California, where they were hitchhiking. Arizona authorities found the Intrepid stuck in a sandbar. It contained a letter Nicklasson had written and some of Richard Drummond's and Melvin Smith's property. Authorities also found shell casings near the Intrepid that matched those recovered at the Smith burglary scene and the Drummond murder scene.

For obvious reasons, Nicklasson does not challenge the sufficiency of the evidence to support his conviction.

## II.

### Rejecting Guilty Plea

■ Nicklasson assigns error to the trial court's decision to reject his attempted guilty plea at his arraignment. The trial court refused the proffered plea.

These additional facts assist in understanding this issue: The state charged Nicklasson with first degree murder on September 1, 1994. On November 10, 1994, the associate division of the Circuit Court of Lafayette County conducted a preliminary hearing the result of which was a decision to bind Nicklasson over to the circuit division of the court on the charge of first degree murder.

On November 15, 1994, the state filed an information charging Nicklasson with first degree murder and, on November 21, the trial court arraigned Nicklasson on the first degree murder charge. The state had not

yet filed a notice of aggravating circumstances. Realizing this, and believing that a guilty plea entered prior to the filing of aggravating circumstances would avoid the possibility of a death sentence, Nicklasson tried to pretermit the process and secure a life sentence without possibility of parole by pleading guilty at the arraignment. The trial court refused to accept the guilty plea, indicating that the state still had time to decide whether it would seek the death penalty under section 565.005.1(1), RSMo 1994. That statute permits the state to file a list of aggravating circumstances within a "reasonable time before the commencement of the first stage of any trial of murder in the first degree at which the death penalty *is not waived.*" (Emphasis added.) The state filed notice of aggravating circumstances on November 29, 1994. Nicklasson's trial did not begin until April 22, 1996.

The state filed its notice of aggravating circumstances within a reasonable time prior to the commencement of trial. Nevertheless, Nicklasson claims that he has a constitutional right to plead guilty at any stage of the proceedings. Reduced to its convoluted essence, Nicklasson asserts: that Missouri recognizes the right to plead guilty; that once such a right is recognized, it must be administered in accordance with due process; that the trial court's refusal to accept the proffered plea at the arraignment violated due process; and that Nicklasson has a right to a remand in this case to plead guilty under the circumstances that existed on November 21, 1994. Nicklasson cites no authority directly supporting his argument.

■ Nicklasson's argument is incorrect for two reasons. First, due process does not require the trial court to accept a guilty plea in a case that carries the potential for the death penalty until such time as the state has determined both the crime with which the defendant is charged and the extent of the punishment the state will seek. Indeed, section 565.005.1(1) requires an affirmative act by the state to waive the death penalty. Thus, the statutory presumption is that where first degree murder is charged, the

death penalty is an option until that punishment is affirmatively waived by the state.

■ Of course, due process requires the state to make its punishment decision within a reasonable time prior to trial to give the defendant notice of the charges and aggravating circumstances against which he must prepare a defense. The eighty-two days the state took from filing the initial charge to filing its list of aggravating circumstances did not violate due process. This is because the trial did not occur until eighteen months *after* Nicklasson received notice of the state's list of aggravating circumstances. For these reasons, we believe the statement in *North Carolina v. Alford,* 400 U.S. 25, 38, n. 11, 91 S.Ct. 160, 167–68, n. 11, 27 L.Ed.2d 162 (1970), that "[a] criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the court" extends to a case in which the state has not made a final decision to seek or waive the death penalty when the defendant attempts to enter a guilty plea.

■ Second, and more important, Nicklasson misreads section 565.005.1(1). As previously stated, section 565.005.1(1) requires an affirmative act by the state waiving the death penalty. Were we to remand this case to permit Nicklasson to plead guilty as things stood on November 21, 1994, the guilty plea would operate as Nicklasson's waiver of notice of aggravating circumstances and a willingness to accept the possibility of a death sentence. This is because the state had not affirmatively waived the death penalty as section 565.005.1(1) requires. We doubt Nicklasson seeks this result. In any event, the trial court did not err in refusing the profferred guilty plea.

The point is denied.

## III.

### Trial Judge Recusal

■ Nicklasson asserts that the trial judge harbored bias both against him and in favor of the state and that the trial judge's refusal to recuse himself violated his right to due process. His claim is based on the trial court's rulings, statements and actions in judicial proceedings directly related to Nicklasson's case.

■ Usually, questions concerning a judge's qualification to hear a case are not constitutional questions; they are, instead, questions answered by common law, statute or the code of judicial conduct. *Bracy v. Gramley,* —— U.S. ——, ——, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997). In Missouri, recusal of a judge is necessary "if a reasonable person would find an appearance of impropriety ... and doubt the impartiality of the court." *State v. Kinder,* 942 S.W.2d 313, 321 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). A disqualifying bias and prejudice is one with an extrajudicial source that results in the judge forming an opinion on the merits based on something other than what the judge has learned from participation in the case. *State v. Hunter,* 840 S.W.2d 850, 866 (Mo. banc 1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993).

Nicklasson finds bias in the trial court's decisions: not to allow attorney participation in death-qualification voir dire; refusing to excuse for cause a venireperson who did not ultimately serve on the jury; to refer to some of the defense expert testimony as "junk science" (outside the presence of the jury); to express criticism of a member of the defense team; to comment that one defense witness's testimony was "refreshing" and to state during the questioning of another defense witness "let's get on to something that's going to assist this jury in making a decision" after overruling an objection by the state; and to "ridicule" penalty-phase witnesses.

We have reviewed each of these assertions and conclude, noting that several are not supported by the record, that none rises to the level of bias or prejudice toward either party arising from an extrajudicial source. Further, none of Nicklasson's claims remotely support a contention that the trial court's conduct in this case affected the jury in its fact determinations or sentence recommendation.

The point is denied.

## Alleged Error in Admitting Confession

Nicklasson claims trial court error in admitting his confession. His argument in support of this position is twofold: First, he claims he invoked his right to counsel and that it was ignored; second, he claims that he was improperly induced to confess with promises of leniency.

### Alleged Request for Counsel

■■■ The Fifth Amendment's prohibition against self incrimination provides an accused the right to counsel during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Once an accused requests counsel, questioning must cease until counsel has been made available, unless the accused initiates further communication with police. *Edwards v. Arizona,* 451 U.S. 477, 485–486, 101 S.Ct. 1880, 1885–86, 68 L.Ed.2d 378 (1981). This rule applies only where the accused gives "a clear, consistent expression of a desire to remain silent" in order to invoke his rights adequately and cut off questioning. *United States v. Thompson,* 866 F.2d 268, 272 (8th Cir.1989).

■■ Nicklasson received warnings in compliance with the requirements of *Miranda.* The record shows that Nicklasson asked if he could stop answering questions at any time and ask for an attorney. He was assured that he could. Nicklasson then signed a waiver and voluntarily submitted to questioning without requesting an attorney's presence. Nicklasson claims his question was an "ambiguous request" for an attorney. We disagree. It was a question seeking clarification of his rights as read to him. He received the requested clarification. Nothing in the record indicates that Nicklasson ever gave a "clear, consistent expression of a desire" to assert his Fifth Amendment rights and remain silent.

### Alleged Promise of Leniency

■■■ A confession extracted through a promise of leniency is inadmissible. *State v. Chandler,* 605 S.W.2d 100, 116 (Mo. banc 1980). However, we have reviewed the comments of Agent McOmber and find that they were, at most, encouragement to cooperate. McOmber told Nicklasson that he was interested in the truth, as were the courts, and that the courts were interested in whether suspects showed remorse or were cooperative. McOmber's statements contain no explicit or implicit promise of possible leniency. Encouragement to cooperate is far from a promise of leniency and does not, as a matter of law, render a confession involuntary. *State v. Simmons,* 944 S.W.2d 165, 173 (Mo. banc 1997); *State v. Klueg,* 781 S.W.2d 133, 136 (Mo.App.1989); *State v. Wilson,* 755 S.W.2d 707, 709 (Mo.App.1988); *State v. Dixon,* 655 S.W.2d 547, 556 (Mo.App.1983), *cert. denied,* 464 U.S. 1072, 104 S.Ct. 982, 79 L.Ed.2d 219 (1984), *overruled on other grounds, State v. Carson,* 941 S.W.2d 518 (Mo. banc 1997); *Bannister v. Armontrout,* 4 F.3d 1434, 1440 (8th Cir.1993).

The points are denied.

## IV.

### Voir Dire

### A. Limited Voir Dire/

### Judge–Conducted Death Qualification

Nicklasson claims constitutional error from the trial court's limitation of his general voir dire and the solely-by-judge-conducted death qualification of the jury.

"In all criminal prosecutions, the accused shall enjoy the right to a ... public trial by an impartial jury." U.S. CONST. AMEND VI (1791). "In [all] criminal prosecutions the accused shall have the right to ... a speedy public trial by an impartial jury of the county." Mo. CONST. ART. I, SEC. 18(A). The United States Constitution requires only that the jury finally seated be impartial. *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). Likewise, the state constitution requires only that the jury actually impaneled be impartial.

Before addressing his claims, we note that Nicklasson does not assert in his brief before this Court that the jury which served to convict him of first degree murder was in any way impartial or unable to follow the law.

## 1. Voir Dire Introductory Comments

 Nicklasson claims that the trial court misled and confused the members of the venire in its introductory comments to each panel of the venire prior to death qualification.[1] Nicklasson alleges that the re-

---

1. The court's introductory comments to each venire panel, with minor variations, were as follows:

Ladies and Gentlemen, in this case, Allen Nicklasson is charged with first degree murder. As in all first degree murder cases one possible penalty is the death penalty. Because of that possibility it is necessary that you be asked certain questions about your ability to consider the full range of punishment.

The questions you will be asked are asked in every case of first degree murder. The law requires that such questions be asked of you. The inquiry has no relation whatsoever to whether or not he is guilty or not guilty of the offenses charged. As he sits before you he is presumed to be innocent. The State must prove him guilty to you beyond a reasonable doubt before you can find him guilty.

Since we will only have the opportunity to question you regarding the death penalty at this stage of the trial, before the State produces any evidence, I must caution you that you shouldn't conclude that just because you're asked about a possible penalty it is presumed he is guilty. In fact, the law presumes him to be not guilty. It is a part of the jury selection process that occurs in every such case. A trial on the charge of murder first degree is divided into two stages. In the first stage of the trial the jury will decide whether the defendant is guilty beyond a reasonable doubt of murder in the first degree, or whether he is guilty of a lesser degree of homicide that is supported by the evidence, or whether he is not guilty of any offense.

If the defendant is found guilty of murder in the first degree, there will be second stage of trial to determine the punishment to be imposed. The punishment prescribed by law for murder in the first degree is either death or imprisonment for life without eligibility for probation or parole.

In determining the punishment to be assessed the jury must first unanimously determine whether one or more aggravating circumstances exist, and whether such circumstances warrant the imposition of the death penalty. The jurors must individually decide whether mitigating circumstances exist which outweigh the aggravating circumstances and then decide whether or not, under all the circumstances, to assess and declare punishment at death. The Court at that time will instruct you on the applicable law.

You're going to be instructed on aggravating and mitigating circumstances.

Aggravating circumstances are reasons for you to consider the death penalty as an appropriate punishment.

*Mitigating circumstances are reasons for you to consider life without parole as an appropriate punishment.*

If you find the defendant guilty of Murder in the First Degree—that is the *intentional killing of another after deliberation* —you will be asked to decide the penalty to be imposed in this case. The potential penalties for Murder in the First Degree are life imprisonment without the possibility of probation or parole and death.

Under Missouri law you must make several decisions before you are asked to consider whether or not to impose the death penalty. First, you must decide whether the defendant is guilty of Murder in the First Degree. Second, you must decide whether one or more statutory aggravating circumstances apply in this case. Statutory aggravating circumstances are a list of potential facts created by the General Assembly that apply to some but not all cases of Murder in the First Degree.

If the jury unanimously finds that the evidence in aggravation of punishment warrants the death penalty, this Court will instruct the jury that each juror must consider all of the evidence in mitigation of punishment. *Evidence in mitigation of punishment is evidence tending to show that this homicide is not as serious as other homicides, or that the character of this defendant is not as bad as others who have committed Murder in the First Degree, or any other evidence justifying a sentence of life without the possibility of parole.*

The Court will further instruct you that each juror must weigh the evidence independently, and if a juror finds that the evidence in mitigation of punishment outweighs the evidence in aggravation of punishment, the juror must vote to impose a sentence of life without the possibility of parole.

*The defendant has the option of presenting evidence in mitigation of punishment, but is never required to present any evidence.* If the defendant presents such evidence, you will listen to such evidence and consider such evidence during your deliberation. If the jury has unanimously found that at least one statutory aggravating circumstance applies to this case and that the evidence in aggravation of punishment warrants the imposition of the death penalty, and if a juror has found that the evidence in mitigation of punishment does not outweigh the evidence in aggravation of punishment, this Court will instruct the jury that such a juror must then decide whether to vote for the imposition of a sentence of death or for the imposition of a sentence of life without the possibility of parole. The Court will further instruct the jury that before the jury can return a verdict of death such a verdict must be the unanimous decision of the jury.

The Court will further instruct the jury that the State has the burden of proving beyond a reasonable doubt that the evidence in aggravation of punishment warrants the imposition of the death penalty.

If the jury is unable to unanimously find that the State has proven at least one statutory aggravating circumstance beyond a reasonable doubt, the Court will instruct you that you must impose

marks were improper because: the instructions did not provide a definition of murder in the first degree; did not offer a meaningful definition of mitigating circumstances;[2] omitted descriptions of important steps of the process of jury consideration of punishment in the penalty phase of the trial; indicated that Nicklasson had to present mitigating evidence in order for the jury to consider a sentence less than death; and indicated that the defendant could present evidence comparing his crime to other capital cases and himself to other capital defendants.

Nicklasson's claims are without merit. First, the quoted portions of the trial court's comments refute most of his assertions of error based on omission. Second, Nicklasson's brief fails to favor the Court with legal argument or authority tying his generalized assertions of error to specific prejudice. Absent such argument, there is nothing for the Court to review. *State v. Isa,* 850 S.W.2d 876, 900 (Mo. banc 1993). Finally, assuming *arguendo,* that the trial court misspoke in some way during its introductory presentation to the venire, the jury received proper instructions during the guilt and penalty phases of the trial correcting the trial court's earlier error before deliberations began. *State v. Gray,* 887 S.W.2d 369, 379 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995).

The points are denied.

### 2. General Voir Dire

Nicklasson claims the trial court erred in failing to allow the defense adequately to question the venire panels regarding the law and evidence the jury might hear on the issue of diminished capacity and in refusing to allow questioning of the potential jurors about the evidence of unadjudicated other crimes that the court had ruled were admissible in the penalty phase only.

#### a.

■■■■ A few broad comments regarding voir dire are in order first. The purpose of

voir dire is to determine which persons harbor bias or prejudice against either party which would make them unfit to serve as jurors. *State v. Antwine,* 743 S.W.2d 51, 60 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). "[T]he examination of jurors as to their qualifications is conducted under the supervision of the trial court and the nature and extent of the questions counsel may ask are discretionary with that court." *State v. Smith,* 649 S.W.2d 417, 428 (Mo. banc), *cert. denied.,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). A defendant has a right, through the process of voir dire, to discover bias or prejudice on the part of prospective jurors. This is a right to participate in voir dire, not to dictate how voir dire is conducted. The trial court is vested with wide discretion in the conduct of voir dire. *State v. Ramsey,* 864 S.W.2d 320, 335 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). *Id.* The nature and extent of questioning on voir dire is within the discretion of the trial judge. We review the trial court's actions for abuse of discretion. Where appellant claims the trial court abused its discretion, appellant has the burden of showing "a real probability that he was thereby prejudiced." *State v. Gray,* 887 S.W.2d at 382.

#### b.

■■■ In support of his argument that he had a right to probe the venire more fully on diminished capacity and unadjudicated crimes, Nicklasson seizes language from *State v. Young,* 844 S.W.2d 541, 547 (Mo.App. 1992), and *State v. Finch,* 746 S.W.2d 607, 613 (Mo.App.1988). In *Young,* the court rebuffed a claim that the trial court had permitted too-broad voir dire by the state. The court said that "[c]ounsel is afforded much latitude in probing the venire panel to determine preconceived prejudices which would prevent them from following the court's instructions." *Young,* 844 S.W.2d at 547. In

the sentence of life without the possibility of parole. (Emphasis added.)

**2.** There is no constitutional requirement that the trial court provide an instruction on mitigating

circumstances, even in the penalty phase. *Buchanan v. Angelone,* — U.S. ——, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

*Finch,* the court found reversible error in the trial court's decision to limit inquiry into whether a potential juror would automatically believe a person who claimed to have been raped. The court said that "[i]t is the rule in this state that a liberal latitude is allowed in the examination of the jurors on voir dire." The court also wrote, "Litigants have the right, through the process of voir dire, to discover bias or prejudice on the part of prospective jurors and they should be allowed wide latitude in the search for open minded jurors." *Finch,* 746 S.W.2d at 613.

*Young* and *Finch* cannot be read to permit the unfettered voir dire for which Nicklasson argues. Reading further in *Young,* we discover reference to *State v. White,* 699 S.W.2d 19 (Mo.App.1985). *White* says:

No fixed and inflexible rule may be laid down which may in all cases determine the extent to which counsel may go in the examination of jurors upon voir dire. Such examination is conducted under the supervision of the trial court, and in such matters the court necessarily has considerable discretion.

*White,* 699 S.W.2d at 21, *citing State v. Crockett,* 419 S.W.2d 22 (Mo.1967).

We are back where we began, even giving *Finch* and *Young* their full due. The test of the adequacy of voir dire is whether the *process* permits the parties to discover bias, prejudice or some other form of impartiality on the part of potential jurors. The trial court abuses its discretion and reversal is required only if the voir dire permitted does not allow the discovery of bias, prejudice or impartiality in potential jurors.

### c.

### *Diminished Capacity*

■ Nicklasson claims that the trial court improperly restricted his inquiry concerning the venire panel's ability to follow an instruction regarding diminished capacity. The record supports his claim that he was not allowed to probe each juror as to every facet of the diminished capacity instruction. The record also shows that the trial court permitted Nicklasson's counsel to read MAI–CR3d 308.03 relating to diminished capacity to the

venire and ask if the potential jurors could follow it. Two jurors had questions about the instruction. Nicklasson's counsel explained the instruction and probed those two jurors' understanding of it. This voir dire produced no indications that any venireperson would be unable to follow the instruction or consider a diminished capacity defense.

### d.

### *Unadjudicated Crimes*

■ Nicklasson also claims that the trial court improperly barred him from questioning the venire about the effect of evidence of two other homicides Nicklasson admitted to committing while in Arizona would have on them. The trial court precluded this line of questioning because it improperly sought a commitment from the venire, it was "blatantly prejudicial" and the court could not "conceive of any evidence of [the Arizona homicides] that [would] get in front of this jury in the [guilt] phase." In fact, the jury did not hear evidence of the other homicides in guilt phase other than a brief reference to an "unspecified weapons offense." We find no abuse of discretion in the trial court's decision to pretermit questioning in this area during voir dire.

### 3. Death Qualification

■ Nicklasson's primary challenge to the voir dire focuses on the trial court's procedure for death qualification of the venire. He contends that the trial court violated his constitutional rights by prohibiting Nicklasson from asking questions during the death qualification portions of the voir dire. (The trial court imposed the same limitation on the state's counsel.) Specifically, Nicklasson asserts that the death qualification portion of the voir dire violated his rights to due process, U.S. CONST. AMENDS. V & XIV and Mo. CONST. ART. I, SEC. 10; to an impartial jury and effective assistance of counsel, U.S. CONST. AMENDS. VI & XIV and Mo. CONST. ART. I, SEC. 18(A); and to be free from cruel and unusual punishment, U.S. CONST AMENDS. VIII & XIV and Mo. CONST. ART. I, SEC. 21.

The trial court conducted the entire death penalty qualification portion of the voir dire,

asking these ten questions of every potential juror:

1) Could you after a fair and impartial consideration of all the evidence in the case, the Court's instructions, and the argument of counsel, decide whether the defendant is guilty beyond a reasonable doubt of Murder in the First Degree or whether he is guilty of a lesser degree of homicide, or whether he is not guilty?

2) Could you follow the Court's instructions and consider the evidence of aggravating circumstances?

3) Could you follow the Court's instructions and consider the evidence of mitigating circumstances?

4) Could you follow the Court's instructions and consider the evidence of mitigating circumstances and individually decide that the mitigating circumstances outweigh the aggravating circumstances?

5) Could you follow the Court's instructions, consider the aggravating circumstances and the mitigating circumstances, and unanimously decide with your other jurors that the aggravating circumstances outweigh the mitigating circumstances?

6) Could you follow the Court's instructions, and after considering all the evidence in the case, and after considering both aggravating and mitigating circumstances, consider the imposition of the death penalty?

7) Could you follow the Court's instructions, and after considering all the evidence in the case and after considering both aggravating and mitigating circumstances, consider the imposition of life without probation or parole/death penalty?

8) Would you after having found the defendant guilty beyond a reasonable doubt of Murder in the First Degree automatically vote for imposition of the death penalty?

9) Would you after having found the defendant guilty beyond a reasonable doubt of Murder in the First Degree automatically vote for imposition of the sentence of life without probation or parole?

10) Would you after having found the defendant guilty beyond a reasonable doubt of Murder in the First Degree follow the Court's instructions and consider both the imposition of the death penalty or the imposition of the sentence of life without probation or parole?

A reading of the United States Supreme Court's decisions interpreting the constitutional requirements for voir dire in capital cases reveal these broad principles applicable in this case: that the constitution requires that a defendant be afforded an impartial jury, AMEND. VI; that "certain" inquiries are required to "effectuate constitutional protections," *Morgan v. Illinois*, 504 U.S. 719, 730, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992); that the purpose of these inquiries is to permit the trial court and the parties to determine those members of the venire that harbor bias such that they cannot be impartial, *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981); and that the party wishing to exclude a juror must "demonstrate, through questioning, that the potential juror lacks impartiality." *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 851–52, 83 L.Ed.2d 841 (1985).

In a state in which jurors make a sentencing recommendation in capital cases, a potential juror is not "impartial" if the juror will automatically vote for the imposition of the death penalty without regard to evidence or legal instructions, *Witherspoon v. Illinois*, 391 U.S. 510, 522, n. 21, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968), or if the potential jurors' views would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," *Witt*, 469 U.S. at 424, n. 5, 105 S.Ct. at 852 n. 5. Thus, in cases that do not have a potential for racial bias, *Ham v. South Carolina*, 409 U.S. 524, 526–27, 93 S.Ct. 848, 849–51, 35 L.Ed.2d 46 (1973), the "certain" inquiries to which *Morgan* refers are two-fold: First, the *Witherspoon* question, designed to assure the defendant that the jury is not "organized to return a verdict of death," *id.* at 521, 88 S.Ct. at 1776, and second, the complementary *Witt* question, designed to permit the state to test whether a venireperson's aversion to the death penalty would result in an automatic vote for a

sentence of life without parole. Together these questions are designed to produce "a jury that could impartially decide all of the issues in [a capital] case." *Lockhart v. McCree*, 476 U.S. 162, 180, 106 S.Ct. 1758, 1768–69, 90 L.Ed.2d 137 (1986).

We read the cases, particularly *Morgan*, to hold that the absence of the *Witherspoon* inquiry is tantamount to a denial of fundamental fairness in a capital trial. For this reason, *Morgan* speaks of "a right to make inquiry" in the defendant, the purpose of which is to permit the defendant "to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt." *Id.* at 733, 112 S.Ct. at 2232. This intelligent exercise of challenges for cause depends on a voir dire that permits the defendant to meet his (or her) burden of demonstrating that a potential juror lacks impartiality.

It is the sufficiency of the inquiry permitted on voir dire that *Morgan* sanctifies, not the person actually asking the questions. For this reason, we reject Nicklasson's claim that defense counsel must conduct the death-qualification voir dire for it to be constitutional. The Supreme Court's interpretation of the constitution is fully satisfied if the trial court asks the appropriate questions and permits the level of inquiry the cases suggest. This is so despite our preference for attorney questioning in voir dire. The constitution is both deaf and blind as to its preference regarding who actually asks the questions in voir dire. All that matters is that the constitutional waterfront is covered—that sufficient inquiry by someone is permitted to ferret out bias, prejudice and impartiality in potential jurors.

Was voir dire in this case sufficient? In *Morgan*, a divided Supreme Court held that general fairness and follow-the-law questions did not permit sufficient inquiry to assure either party an impartial jury.[3]

> *Witherspoon* and its succeeding cases would be in large measure superfluous were this Court convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.... Any juror who would impose the death penalty regardless of the facts cannot follow the dictates of the law. [citation omitted]. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascer‚ain whether his prospective jurors function under such misconception.... Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue in his trial, that being whether to impose the death penalty.

*Morgan*, 504 U.S. at 734–36, 112 S.Ct. at 2232–34.

The voir dire in this case did not suffer from the deficiencies found in the *Morgan* voir dire. The trial court specifically asked the automatic-sentence question from both sides. In addition, the trial court inquired whether a potential juror could consider both punishments as well as both mitigating and aggravating circumstances. The voir dire in this case satisfied the sufficiency-of-inquiry requirements imposed by *Witherspoon–Witt–Morgan*.

 If the voir dire is constitutionally sufficient, the final decisions as to which members of the venire are not impartial lies

---

**3.** In *Morgan*, the trial court asked each venire: "Whether any member had moral or religious principles so strong that he or she could not impose the death penalty 'regardless of the facts.'" The trial court also asked all individual venirepersons "Would you automatically vote against the death penalty no matter what the facts of the case were?" The trial court asked some, but not all venirepersons: "Would you follow my instructions on the law even though you may not agree?" And the trial court asked all venirepersons either: "Do you now of any reason why you cannot be fair and impartial?" or "Do you feel you can give both sides a fair trial?" Although requested by the defendant, the trial court refused to ask, "If you found Derrick Morgan guilty, would you impose the death penalty no matter what the facts are?" *Morgan*, 504 U.S. at 722–724, 112 S.Ct. at 2226–27.

within the sound discretion of the trial court. Voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Morgan,* 504 U.S. at 729, 112 S.Ct. at 2229–30, *quoting Ristaino v. Ross,* 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), *quoting Connors v. United States,* 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895). "A trial court's findings of juror impartiality may 'be overturned only for "manifest injustice." ' " *Mu'Min v. Virginia,* 500 U.S. 415, 428, 111 S.Ct. 1899, 1906–07, 114 L.Ed.2d 493 (1991), *quoting Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888–89, 81 L.Ed.2d 847 (1984), *quoting Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961).

Nicklasson moved to disqualify several venirepersons for cause. Though most of his motions to strike for cause were sustained, the trial court overruled several. In each instance when it overruled a motion to strike for cause, the trial court explained its reasoning. Again, giving the trial judge—who saw and heard each potential member of the jury—the appropriate measure of deference, we can not find error in the trial court's failure to strike the venirepersons for cause. *Wainwright v. Witt,* 469 U.S. at 426, 105 S.Ct. at 853–54.

Moreover, under section 494.480.4, RSMo, denials of challenges for cause—even if erroneous—are not a basis for reversal of a conviction or for granting a new trial where such venirepersons do not actually sit on the jury, that determines guilt and/or recommends punishment. The test under the statute and the constitution is whether the jury actually seated was impartial. *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). Therefore, we individually address Nicklasson's claims of erroneous failure to strike for cause only as to jurors Poletsky, Hutton, and Sorensen, who actually served on Nicklasson's jury.

Nicklasson claims that juror Mildred Poletsky hesitated when she answered the court's death-qualification questions, that she asked the court to repeat a question, that she allegedly answered some questions in a stronger manner than others and that the trial court abused its discretion in denying his motion to strike her for cause. The trial court said that it "was persuaded from viewing the demeanor of Ms. Poletsky, seeing her responses to the questions that she'll listen to the evidence and the exhibits, and she'll render a fair and impartial verdict based on those things alone and will follow the Court's instructions and consider the full range of punishment."

Nicklasson claims that the trial court abused its discretion when it overruled his motion to strike juror Nancy Hutton for cause because she hesitated when she answered the court's death-qualification questions. The trial court said that it "was persuaded that Ms. Hutton will consider the evidence, the exhibits, and the arguments of counsel, and the Court's instructions and consider the full range of punishment and render a fair and impartial verdict based on that. So the request for strike for cause . . . will be denied."

Nicklasson moved to strike juror Joann Sorensen for cause because Sorensen's husband knew the victim in this case, she may have seen some pre-trial publicity about the case and she alleged hardship due to her daughter's upcoming confirmation. Nicklasson claims that the trial court abused its discretion in failing to sustain his motion.

The record shows that Ms. Sorensen answered the court's death-qualification questions consistently and conscientiously. The day after she was first questioned as a member of the venire, she brought to the court's attention that her husband knew the victim. She told the court that she did not remember whether she had read anything about the case, that she could disregard it if she remembered anything and that the connection between her husband and the victim would not affect her ability to be fair and impartial. The court was "persuaded she could listen to the testimony, see the exhibits, listen to the Court's instructions and render a fair and impartial verdict based on that alone."

Nicklasson has the burden of showing "a real probability that he was thereby prejudiced." *State v. Gray,* 887 S.W.2d at 382.

Since he does not claim that any member of the venire who ultimately served on the jury was biased, Nicklasson does not meet his burden of showing "a real probability that he was thereby prejudiced." *Id.*

We find no manifest injustice or abuse of discretion in the trial court's decision with regard to these jurors.

The point is denied.

## V.

### Alleged Batson Violations

Nicklasson claims that the court erred in allowing the state to strike, peremptorily, two African–American jurors and one female juror based on gender, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 127–29, 114 S.Ct. 1419, 1419–22, 128 L.Ed.2d 89 (1994).

██ A *Batson* challenge is a three-step process. First, defendant raises a challenge to the state's peremptory strikes based on race or gender and identifies the cognizable group to which the venirepersons belong. *State v. Parker*, 836 S.W.2d 930, 939–40 (Mo. banc), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). The state must then provide a reasonably specific and clear, race-neutral explanation for the strike. Once the state provides an acceptable reason, the burden shifts to the defendant to show that the state's reasons are pretextual and that the strikes are actually racially motivated.

 A prosecutor's explanation, if reasonably specific, clear and race-neutral, will be sufficient to uphold a strike unless there is an inherently discriminatory intent in the explanation. *State v. Weaver*, 912 S.W.2d 499, 509 (Mo. banc 1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996). The chief consideration is how plausible the prosecutor's explanations are in light of the totality of the facts and circumstances. *Parker*, 836 S.W.2d at 939. Any facts or circumstances that detract from or lend credence to the prosecutor's proffered explanations are relevant. *Id.* In evaluating the reasons for a strike, the trial court may take into account many factors including the demeanor of the prosecutor, the existence of similarly-situated white or male jurors not stricken by the prosecution and objective factors that would cause the state to discriminate on the basis of race. *Id.* The existence of similarly-situated white or male jurors is probative of pretext, but it is not dispositive. *Id.* This Court will set aside the trial court's finding only if it is clearly erroneous. *Id.*

██ In defense of its decision to use a peremptory challenge to venireperson Ms. Yokley, the state explained:

> During the Court's death qualification about whether or not you could consider death penalty, life, automatic death, automatic life, Ms. Yokley's response was that while she could ... consider both that she would probably return a sentence of life without parole. She was one of the few that went that far to show favoritism towards one or other personalities during that qualification process [sic].

The fact that Ms. Yokley answered that she would "probably" impose a life sentence is sufficiently neutral reason for exercising a peremptory strike to withstand a *Batson* challenge.

Nicklasson argues that the state did not challenge venireperson Floyd—a white person—who also answered that she "believed" she would impose life. Nicklasson claims this fact supports his argument that the state challenged Ms. Yokley on account of her race. That the state did not challenge Ms. Floyd does not necessarily show that a *Batson* violation has occurred. The state is entitled to make judgments about the strength of a particular venireperson's commitment to the life-without-parole option, vis-a-vis, that of another venireperson whose words do not convey the same conviction. Here the trial judge stated:

> The Court has had an opportunity to review the strikes made by both sides. The Court is persuaded that the strike was not made for any reason set out in *Batson v. Kentucky* or any of the other cases.... And the Court is persuaded that it is race neutral.

We discover no clear error in the trial court's decision.

██ In defense of its peremptory challenge to venireperson Karen McNeil, the prosecutor stated:

[T]he record will ... reflect that she works for the Illinois Department of Family Services, has extensive contact with people involved in child abuse. We just didn't want her to bring up her experiences in the jury room.

Nicklasson argues that juror Lynn Stark, a white person, was similarly situated to Ms. McNeil, and that a *Batson* violation occurred because the state peremptorily challenged Ms. McNeil and not Ms. Stark.

██ Employment is a valid, race-neutral reason for exercising a peremptory strike. *State v. Gray,* 887 S.W.2d at 384–385; *State v. Smulls,* 935 S.W.2d 9, 15–16 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2415, 138 L.Ed.2d 180 (1997). A clinical nurse, Ms. Stark, specialized in child psychology; Ms. McNeil investigated child abuse cases. The two jobs are different. Focusing on the most superficial distinctions, one deals with the physical and familial aspects of a child's life and attempts to stop or prevent abuse. The other confronts the psychological and clinical aspects of child abuse and attempts rehabilitation of the mind and spirit after abuse has occurred. The trial court was "persuaded that there are quantum differences between the two jobs, and [the court does not] believe there [is] any racial motivation in the challenge."

██ As with race, the United States Supreme Court has prohibited the use of peremptory challenges solely on the basis of a venireperson's gender. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. at 127–29, 114 S.Ct. at 1419–22. The prosecution struck venireperson Teri Martin because, Nicklasson claims, Martin is a woman.

In defense of exercising a preemptory challenge to strike venireperson Teri Martin, the prosecutor noted:

Ms. Martin was one of the last people we struck. We were having a hard time finding people to strike. With Ms. Martin, basically the reason we ended up striking

her is because she didn't say anything during the two days of general voir dire, and we had no idea of her position on anything.

The state's reason for striking Ms. Martin—failure to participate actively in voir dire—is gender-neutral on its face. The court did not clearly err in upholding the state's peremptory strike against Nicklasson's *J.E.B.* challenge.

The points are denied.

## VI.

### Alleged Erroneous Excusals for Cause

Nicklasson claims the trial court erred in excusing jurors Fleece and Wozniak for cause after the members of the jury had been chosen.

### A. Juror Fleece

██ First, we note that Nicklasson tried to strike Ms. Fleece for cause, a motion the trial court overruled. Now, he assigns error to the trial court's decision to dismiss her as a juror because she began crying hysterically immediately after the list of jurors was read. The trial court called counsel to the bench to discuss dismissing her after she began crying. The court stated:

Ms. Fleece is having a nervous breakdown in front of us.... No one else is being as emotional as she is. She's being incapable of considering, what I see here.

Section 494.485, RSMo 1994, permits the trial court to replace jurors who "become or are found to be unable or disqualified to perform their duties." Given Ms. Fleece's inappropriate emotional response to news of her jury service, we find no abuse of discretion by the trial court's decision that she was unable to perform her duties as a juror and in replacing her with an alternate.

### B. Juror Wozniak

██ Ms. Wozniak was originally selected as an alternate juror. She took Ms. Fleece's place after Ms. Fleece's excusal. The trial court received a note from Ms. Wozniak's doctor, Dr. Craig Boyd, indicating that Ms. Wozniak, who was pregnant, was subject to

pre-term labor and that her doctor believed health considerations counseled against jury service. The trial court later received a call from Wozniak's husband—also a doctor—restating what Dr. Boyd had written.

The trial court asked Ms. Wozniak whether she could sit on the jury. She replied:

I honestly don't think that I can sit here for the next 14 days. It's uncomfortable to sit here hour after hour. I have very bad veins. And I didn't mention this in my questionnaire. I really didn't think it pertinent at the time when you're called for jury duty.

And it's just 99 percent of the population who gets called for jury duty and doesn't probably get called for this kind of duty. And that's probably why I didn't bring that up before. But do I think I can sit here for 14 days comfortably and be able to concentrate? I doubt it.

Given the pre-term labor susceptibility, vein problems, and inability to concentrate reported by Ms. Wozniak and her doctor, we find no abuse of discretion in the trial court's decision to excuse her. SECTION 494.485, RSMo 1994.

The points are denied.

## VII.

### Alleged Improper Argument

### A. Guilt Phase

Nicklasson asserts that the trial court erred in allowing the state to make three guilt-phase arguments.

 The first argument did not raise an objection from Nicklasson's counsel and Nicklasson now seeks plain-error review. RULE 30.20. Read in context, these complained-of statements do not provide substantial grounds for believing that a manifest injustice or miscarriage of justice has resulted. We decline to review for plain error. *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995).

 Next, Nicklasson complains of the prosecutor's statement:

He's seen hundreds of mental health practitioners, not just Dr. Gowdy. Not just the two individuals they hired. He's seen every type of person throughout his life who could treat him. And then, they've tried medications; different diagnoses.

And at the end of all the times he's at each location, if you concentrate and focus on the discharge diagnosis at that time—not on all the different ones he had at discharge—each time, he's better than he was before.

Nicklasson's objected and now claims these statements were false. While the record does not support the large number ("hundreds") of mental health practitioners to which the argument refers, the record does support the substance of the treatment aspects of the statement. Doctors Churchill, Fossey–Bisaha and Hampton all testified to times where Nicklasson's mental health condition improved just as the prosecutor stated. It is permissible to argue facts in evidence. Moreover, the trial court has broad discretion in determining the scope of arguments and counsel is afforded wide latitude in summation. *State v. Twenter,* 818 S.W.2d 628, 634 (Mo. banc 1991). Unless there is an abuse of discretion that prejudices the defendant, this Court will not disturb the trial court's rulings on matters involving closing argument. *State v. Mahurin,* 799 S.W.2d 840, 844 (Mo. banc.1990), *cert. denied,* 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991).

 Last, Nicklasson argues that the prosecutor impermissibly lodged an attack against defense counsel by suggesting that the defense was fabricated. The complained of statements were:

[The] counsel for the defendant are quite good.... [The defense team] has defended the defendant; presented this defense to you.

Nicklasson's claim that these words suggest fabrication by the defense. This interpretation of the language used is not supported by the meaning normally associated with those words.

The points are denied.

## VIII.

## Evidentiary Issues

### A. Guilt Phase

#### 1. Separate Crimes Evidence

■ Nicklasson challenges the trial court's action in admitting evidence of the burglary of the Smith home, an assault, and "unspecified weapons offenses" from other states in the guilt phase.

■ "Evidence of uncharged crimes that are independent of and logically relevant to a fact issue in the case may be admissible if the probative value outweighs the prejudice." *State v. Gray*, 887 S.W.2d at 386. This Court faced, and rejected, the issues raised by Nicklasson previously in *Skillicorn*. There, the majority held that when evidence of other crimes shows the sequence of events surrounding the charged crime, the evidence is admissible provided it has some legitimate tendency to prove that the accused committed the crime for which he is being tried and is more probative than prejudicial. *Skillicorn*, 944 S.W.2d at 887. There is no reason to depart from the majority's position in *Skillicorn*.

The point is denied.

#### 2. Diminished Capacity

Nicklasson claims that rulings of the trial court effectively prevented him from presenting a diminished capacity defense.

##### 266 Exhibits

■ Nicklasson argues that the trial court erred in failing to submit to the jury 266 exhibits that Nicklasson insists qualified under the business record exception to the hearsay rule. Because Nicklasson does not provide specific argument for each of the 266 exhibits, he waives any claim of error as to those exhibits for which he provides no specific argument. *State v. Isa*, 850 S.W.2d at 900.

■ As to those for which Nicklasson provides argument, many of the records contained hearsay. Even if a document falls under the business record exception, the document is inadmissible if the underlying statement it contains is inadmissible hearsay. *State v. Sutherland*, 939 S.W.2d 373 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 186, 139 L.Ed.2d 125 (1997). The trial court did not err in refusing to admit these documents.

■ Thirty-two of the exhibits related to Nicklasson's mother and were cumulative of evidence before the jury already. *See* discussion, *infra*, Section IX, B, 2, "265 Exhibits."

Other exhibits related to Nicklasson. However, they related to conditions and events already in evidence. As such, they were cumulative. No error resulted from the trial court's decision barring these exhibits.[4]

##### *Simpson Testimony*

■ Nicklasson claims that the trial court erred in precluding David Simpson's testimony. Nicklasson claims that Mr. Simpson's testimony would have provided evidence directly contradicting the state's inference that Nicklasson was better each time he left a facility. The jury heard ample evidence of Nicklasson's long-standing mental problems.

The defense wanted to show, through Mr. Simpson's testimony, that Mr. Simpson thought Nicklasson needed long-term treat-

---

4. In fact, after reviewing the exhibits, Nicklasson was likely aided by the omission of many of them. From a prison superintendent, while Nicklasson was serving a sentence prior to this crime, the jury would have learned that "he killed his father, attempted to kill his step-father, and is presently serving time for the assault of a correctional officer. Unfortunately for the citizens of this State, his maximum release date is December 6, 1993.... [T]his man without a doubt will kill someone when released." From a psychiatric evaluation, the jury would have discovered that "he was ... able to identify the extent of his anger and potential for violence.... [Nicklasson] expressed a great deal of apprehension about the future and a fear that his ability to function in the free world may lead to further criminal behavior and potential for violence towards himself as well as others. He was however rational...." From another psychiatric evaluation, the jury would have read that "[Nicklasson] reports enjoying intimidating the weaker inmates."

ment in a structured setting. As such, his testimony would not show that Nicklasson had not made improvements in his treatments, only that further improvement was needed. The evidence already before the jury had made this point.

### Bailey and Henry Testimony

■ Nicklasson assigns error to the trial court's refusal to let defense counsel, Bailey and Henry, testify that they made "constant efforts to keep [Nicklasson] composed during the trial because of their fear that he would erupt in the courtroom." The defense sought to offer this testimony after the state asked Dr. Robert Geffner on cross-examination:

Q: It's my understanding that that makes it more likely that that defendant is going to go off; is that right?

A: If he perceives it as stressful and his stress level goes high, that is accurate.

Q: Well, do you think sitting in a courtroom on trial for capital murder is a stressful situation?

Nicklasson characterizes the purpose of this question as showing that Nicklasson did not suffer from a mental disease or defect because he did not "act out" during the trial.

■ The trial court sustained a defense objection to this question and denied defense request for a cautionary instruction and for a mistrial. Because the trial court observes the testimony and its impact, appellate review of remedial action to correct improper questioning is for abuse of discretion. *State v. Parker*, 886 S.W.2d at 908, 922 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Feltrop*, 803 S.W.2d 1, 9 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991).

Giving the trial court the benefit of its superior position to weigh the impact of this question, we cannot say that the trial court erred in sustaining the objection and in refusing to give a limiting instruction or declare a mistrial or in refusing to permit Nicklasson's counsel to testify as to their efforts to keep Nicklasson from acting out at trial.

### Ability to Deliberate

■ Nicklasson alleges that he was improperly precluded from presenting testimony from Drs. Geffner and Logan regarding his ability to deliberate. The trial court properly excluded this evidence. Both doctors based their opinion—that his ability to deliberate was impaired—on Nicklasson's voluntary substance abuse. Introduction of a voluntary drugged state to negate a culpable mental state is prohibited. SECTION 562.076.3, RSMo 1994; *State v. Roberts*, 948 S.W.2d 577, 588 (Mo. banc 1997). A jury may not consider voluntary intoxication on the issue of a defendant's mental state.

### 3. Other Evidentiary Issues
### State's Exhibits P4 and P7

■ Nicklasson claims that the trial court erred in admitting exhibits P4 and P7, Drummond's AT & T pocket knife and key chain, over his objections. He claims that the state failed to lay a proper foundation to show chain of custody of those items.

The trial court heard testimony about the normal protocol when bodies arrive for autopsy: Michael Phillips, an assistant at the Fountain Mortuary, where the autopsy was performed, testified that he assists in unclothing the bodies, goes through the pockets and gives any contents to law enforcement authorities. Trooper Oberweather, of the Missouri State Highway Patrol, testified that he received the knife and keychain from Mr. Phillips. Mr. Drummond's wife testified that the key chain and knife were similar to those her husband carried and that their house key was on the key chain.

■ The sufficiency of the evidence to support a finding of a valid chain of custody is within the sound discretion of the trial court. *State v. Murray*, 630 S.W.2d 577, 581 (Mo. banc 1982). The trial court did not abuse its discretion in admitting the knife and key chain.

### Alleged Improper Remarks to the Jury

■ Nicklasson claims that the trial court made remarks to the jury that diminished the jurors' sense of responsibility, thereby

misleading the jury about its role. The challenged comments were:

> You judge the facts. I'm judge of the law. And when we walk away from here, we're going to say the right thing is done. You'll do that, we'll have absolutely no problem. And then they can do whatever they have to do with the rest of the system, and let me assure you this is the beginning of the system. I have no preconceptions about that.
>
> And that's the way it should be. Because, as you've seen, I make decisions in the snap of a finger, and it's hopefully because in the last 30 years I've learned how to snap that finger, but there are other people that are going to be able to look at all this because [the court reporter] is doing her job. She's not just sitting here playing a game.
>
> But the job right now is your job and my job. We do everything right. We can feel good about it no matter what happens later.

Nicklasson compares these statements to those condemned in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

In *Caldwell*, the Court reversed a conviction because the trial court told members of the jury that their decision was not "the final decision" and that "the decision you render is automatically reviewable by the Supreme Court." *Id.* at 342, 105 S.Ct. at 2646–47.

The trial judge's comments, in his pre-trial statement to the jury explaining what they would be doing for the next several weeks, do not lessen the jurors' sense of responsibility. Instead, the trial court suggested that the jurors bore a grave responsibility and that they should focus on fulfilling that responsibility without regard to considerations of events that might follow. This is not a *Caldwell* violation.

### Arthur McOmber's Testimony

■ Nicklasson argues that testimony from FBI Special Agent Arthur McOmber was improperly admitted. Nicklasson asserts in his brief to this Court that this exchange was "both improper and highly prejudicial," but he cites no authority and presents no argument to support those broad conclusions. His argument is waived. *State v. Isa*, 850 S.W.2d at 900.

### B. Penalty Phase

#### 1. Other Crimes Evidence

■ Nicklasson alleges that the trial court erred in admitting other crimes evidence during penalty phase. This evidence showed that Nicklasson had discharged a firearm in California, committed serious assaults and had admitted to two additional murders in Arizona.

■ Separate punishment phases exist in capital cases to permit the presentation of a wide range of evidence about the defendant's past character and conduct, while avoiding the possibility of placing prejudicial or irrelevant evidence in front of the jury before the determination of guilt or innocence. *Gregg v. Georgia*, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976). The sentence-recommender should generally hear any evidence that aids it in making an individualized determination of an appropriate punishment. *State v. Kreutzer*, 928 S.W.2d 854, 874 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). This evidence includes evidence of separate crimes. *State v. Wise*, 879 S.W.2d 494, 520 (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Jones*, 749 S.W.2d 356, 364 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d 155 (1988).

#### 2. Mitigating Evidence

Nicklasson claims that the trial court improperly prevented him from presenting the following penalty-phase evidence: two-hundred-sixty-five exhibits; evidence about Nicklasson's mother; evidence regarding abandonment by Nicklasson's father; evidence of Nicklasson's mother's sterilization; evidence that Nicklasson was willing to plead guilty to first-degree murder; a display to the jury of Nicklasson's hand; a photograph of Nicklasson drinking beer with his father; that Skillicorn was the "brains" of the group;

testimony of an art therapist; and evidence that his relatives would visit him in prison.

■ The trial court has broad discretion in determining whether evidence offered during the penalty phase of a capital case is admitted. *State v. Leisure,* 749 S.W.2d 366, 379 (Mo. banc 1988), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). A court may exclude, as irrelevant, any evidence not bearing on the defendant's character, prior record, or the circumstances of his offense. *Lockett v. Ohio,* 438 U.S. 586, 604, n. 12, 98 S.Ct. 2954, 2964–65, n. 12, 57 L.Ed.2d 973 (1978). Absent clear abuse of discretion, an appellate court will not interfere with the trial court's ruling on admission or exclusion of evidence. *State v. Heinz,* 607 S.W.2d 873, 877 (Mo.App.1980); *State v. Radford,* 646 S.W.2d 366, 367 (Mo.App.1982); *State v. Kalna,* 595 S.W.2d 299, 300 (Mo.App. 1979). It is not an abuse of discretion for the trial court to limit cumulative evidence. *State v. Heinz,* 607 S.W.2d at 877; *State v. Radford,* 646 S.W.2d at 367; *State v. Kalna,* 595 S.W.2d at 300.

### *Testimony of an Art Therapist*

■ Nicklasson argues that he should have been permitted to present testimony from art therapist, Julie Ball, who would interpret drawings made by the defendant to show his "enormous emotional problems."

The jury heard the testimony of four doctors—Churchill, Logan, Geffner and Flemming—regarding various mental illnesses from which Nicklasson allegedly suffered. The trial court concluded that further evidence of Nicklasson's mental condition would have been cumulative.

### *Evidence that Nicklasson's Relatives Would Visit Him in Prison*

■ Nicklasson claims that the trial court erroneously prohibited Nicklasson from presenting testimony that his relatives would visit him in prison if he was given a life sentence. The record shows that the jury heard Nicklasson's aunt say:

Q. Ms. Novak, do you still care for Allen?

A. Yes, I do.

Q. Now that you know where Allen is, will you keep in contact with him if he's allowed to live?

A. Yes, I will.

Q. Will you visit him in prison?

A. Yes, I will.

The state objected, based on relevancy. The trial court sustained the objection. That a convicted murder's relatives care about him is not relevant to the punishment question.

### *Display to the Jury of Nicklasson's Hand*

■ Nicklasson claims that the trial court erred in refusing to allow him to display his hand to the jury. The jury heard the testimony of several witnesses that Nicklasson chewed and mutilated his hand when he was a child and continued to do so as an adult. These witnesses described Nicklasson's hand variously as callused on the knuckle where he chewed and as a continuous open wound produced by his self-mutilation. A display of the hand to the jury would only have reiterated what these witnesses had already said. Assuming, *arguendo,* that it was error for the trial court to refuse Nicklasson's request, the error was not prejudicial.

### *Mother's Sterilization*

■ The evidence of Nicklasson's mother's sterilization was irrelevant to questions of Nicklasson's character, record or the circumstances of his offense. *Lockett,* 438 U.S. at 604, n. 12, 98 S.Ct. at 2964–65, n. 12. Nonetheless, it was presented to the jury through the testimony of defense witness Novak:

Q: At some point did you and your mother go to a lawyer to see to it that [Nicklasson's mother] couldn't have any more children?

A: Yes, I did.

Q: And why did you do that?

A: Because the men—[Nicklasson's mother's] mental capacity was not up to taking care of a child. She had already abandoned one, abused the child, and now she was pregnant with another child.

* * *

Q: And was there, in fact, an order forcing that she be sterilized upon the birth of Mr. Nicklasson?

A: Yes, there was.

The jury also heard considerable evidence, from a number of sources, that Nicklasson's mother was unfit to parent.

### Photograph of Nicklasson Drinking Beer with his Father

■ The photo in question was apparently a picture of Nicklasson, at age 5 or 6, holding a beer can next to the man he believed to be his father. Nicklasson contends that the photo was relevant to show his exposure to alcohol at an early age and the disparity in size between him and his "father"—who allegedly physically abused him. The jury had before it ample evidence of Nicklasson's life of substance abuse. The picture indicates only that Nicklasson held a beer can and would have added but a straw to a considerable evidentiary hay stack of proof of substance abuse.

Nicklasson also claims that the photo shows the disparity in size between Nicklasson and his father and that this highlighted the brutality of the abuse he suffered as a child. There was ample evidence before the jury that Nicklasson was horribly abused as a child. The jury heard that someone, likely his father or a boyfriend of this mother, had broken his knuckles with pliers when Nicklasson was a small child. The jury also heard evidence of the father's size. The trial court did not err in refusing to admit the cumulative evidence of the photo.

### 265 Exhibits

Nicklasson provides specific argument for only five of the two-hundred-sixty-five exhibits which he claims should have been admitted. Therefore, any claims to error regarding the other two hundred sixty exhibits are waived. *State v. Isa*, 850 S.W.2d at 900.

■ Exhibit 216 offered evidence about Nicklasson's mother, not Nicklasson. Sentencer-recommenders in a death penalty case are required to consider, as mitigating factors, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. at 604, n. 12, 98 S.Ct. at 2965, n. 12. As this exhibit dealt with Nicklasson's mother's mental instability, ample evidence of which had already made its way to the jury, it was not an abuse of discretion for the trial court to deny its relevance.

■ Nicklasson claims that exhibits 239 and 249 would have shown that he was admitted to the hospital for beatings suffered at the hands of his mother's boyfriend. This evidence would have been duplicative of the testimony that was admitted. In addition, and as previously indicated, the jury had heard evidence of the horrible abuse Nicklasson suffered as a child. The trial court did not err in refusing to admit this cumulative evidence.

■ Exhibit 292 stated that Nicklasson had a "symbiotic relationship" with his mother. Dr. Churchill, the author of exhibit 292, testified orally to this conclusion. The exhibit added nothing to the evidence already before the jury.

■ Nicklasson argues that the trial court should have admitted exhibit 272, which indicated that he was diagnosed with "organic brain symptoms." Given the testimony by Dr. Geffner that Nicklasson suffered from "mild brain impairment," we find that no prejudice could have resulted from the failure to admit this exhibit.

### Evidence about Nicklasson's Mother

■ Nicklasson argues that he was precluded from presenting a wealth of information about his mother as mitigating evidence. The record reveals otherwise. The jury heard several witnesses testify about Nicklasson's mother's childhood injuries; her ridicule by classmates; her animosity toward her mother; her lying; her time in a mental hospital; her aggression; her physical attacks on her own mother and her husband; her intimate exploits; her happiness when her mother was dying; her filthy home; her abuse of Nicklasson, and other negative testi-

mony. None of this evidence bore a direct relevance to Nicklasson's own character, previous criminal record, or the circumstances of the crime. *Lockett,* 438 U.S. at 604, n. 12, 98 S.Ct. at 2964–65, n. 12. The trial court did not err in refusing to admit additional, irrelevant evidence.

### Evidence of Nicklasson's Willingness to Plead Guilty to First–Degree Murder

█ Nicklasson argues that he should have been able to present evidence regarding his willingness to plead guilty in exchange for a life sentence without parole, a willingness he claims to have had before, up to and throughout his trial. The record does not support his assertion that he was willing to plead guilty when the death penalty remained an option.

The point is denied.

### Evidence that Skillicorn was the "Brains" of the Group

█ Nicklasson asserts that, since the state argued—in the closing argument of Dennis Skillicorn's trial—that Skillicorn was the "brains" of the group, he should have been able to present to the jury a portion of the transcript from that trial. The portion of the transcript which Nicklasson sought to present was from closing argument in the *Skillicorn* case. As such it was not evidence. Moreover, there is no rule requiring the state to argue mirror-image theories in the separate prosecutions of co-perpetrators. *State v. Fondren,* 810 S.W.2d 685, 689 (Mo.App. 1991); *State v. Nunley,* 923 S.W.2d 911, 925 (Mo. banc 1996), *cert. denied,* — U.S. —, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997).

### Evidence of Abandonment by Father

Nicklasson claims he was precluded from introducing evidence that his father abandoned him at an early age. However, evidence of Nicklasson's father's abandonment—though as the trial court indicated, it "bordered on nonrelevancy"—was presented:

Q: Let me ask you this, Ms. Novak, do you know if Mr. Nicklasson [defendant's father] ever appeared in Mr. Nicklasson's [defendant's] life again?

A: No, he never did.

These points are denied.

## IX.

### Proportionality Review

Section 565.035.3, RSMo 1994, requires that this Court determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Nicklasson does not argue that his sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, nor does he assert that the evidence did not support the finding of the statutory aggravating circumstances. Nonetheless, we undertake our statutory duty.

### A.

We have examined the record and do not find that the imposition of the sentence of death was due to the influence of passion, prejudice, or any other arbitrary factor.

### B.

█ The statutory aggravating circumstances submitted by the trial court and found by the jury were:

One, whether the defendant was convicted of assault in the second degree on April 19th, 1990, in the Circuit Court of Jackson County, Missouri;

Two, whether the defendant was convicted of offering to commit violence to an officer on March 2nd, 1993 in the Circuit Court of Randolph County, Missouri;

Three, whether the murder of Richard Drummond was committed while the defendant was engaged in the perpetration of kidnapping or while the defendant was

knowingly aiding Dennis Skillicorn and/or Timothy Degraffenreid in the perpetration of kidnapping; or

Four, whether the murder of Richard Drummond was committed while the defendant was engaged in the perpetration of robbery.

The jury found that the state proved all four of these aggravating circumstances. The record fully supports that conclusion. Further, Nicklasson does not argue that the evidence did not support the finding of these statutory aggravating circumstances.

### C.

■ In determining whether the death sentence in this case is proportionate, we consider similar cases where the death sentence was imposed.

This Court has upheld sentences of death where the defendant commits an execution-style shooting of a defenseless victim. *State v. Whitfield*, 939 S.W.2d 361 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997); *State v. Murray*, 744 S.W.2d 762 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Foster*, 700 S.W.2d 440 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). The fact that Nicklasson has committed several prior serious assaultive offenses, including two other homicides, adds further support for the imposition of the death penalty. *Cf. Foster*, 700 S.W.2d at 440; *State v. Chambers*, 714 S.W.2d 527 (Mo. banc 1986).

Nicklasson's punishment is not excessive or disproportionate in light of the crime and the strength of the evidence against him.

### X.

Nicklasson raised several other points. We have reviewed each of them and determine that they have been previously and recently decided by this Court adversely to Nicklasson's position. In addition, several other points not individually addressed are facially without merit Discussion of these points would serve no purpose but to unduly burden the pages of the Southwestern Reporter. As these claims have no precedential

value, they are denied without further discussion. RULE 30.25(B).

### XI.

The judgment of guilt and the sentence of death are affirmed.

PRICE, LIMBAUGH and HOLSTEIN, JJ., concur.

COVINGTON, J., concurs in part and dissents in part in separate opinion filed.

BENTON, C.J., and WHITE, J., concur in opinion of COVINGTON, J.

COVINGTON, Judge, concurring in part and dissenting in part.

I concur in the majority opinion with respect to the guilt phase issues, but would reverse and remand for a new penalty phase trial on the basis of the death qualification of the venire.

In *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the United States Supreme Court held that defendants who are subject to imposition of the death penalty have a constitutional right to a *voir dire* of the jury that is sufficient to allow the defendant to exercise intelligently his challenge for cause against those venirepersons biased about the death penalty. *Id.* at 729–34, 112 S.Ct. at 2229–2232. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.* at 729, 112 S.Ct. at 2229–30. If a *voir dire* is conducted in a manner that prevents a defendant from adequately identifying a biased juror, then his sentence of death cannot stand because there is no assurance that his sentence was imposed by a jury impaneled according to the dictates of the Constitution. *Id.* at 739, 112 S.Ct. at 2235.

The sufficiency of the *voir dire* in identifying venirepersons who are not impartial must be measured by the definition of impartiality. A juror is not impartial if the juror's views about capital punishment prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and the juror's oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct.

844, 852, 83 L.Ed.2d 841 (1985). It follows that a juror whose views about the death penalty would prevent or substantially impair the juror from considering both death *and* life without parole according to the instructions is not impartial. Consequently, if a death-qualification *voir dire* does not allow the defendant an opportunity to identify such jurors adequately, then the defendant's constitutional right to an impartial jury has been violated.

This Court has emphasized repeatedly the importance of a thorough death-qualification *voir dire*. "In a capital murder case, inquiry into the venire members' views about the death penalty is of critical importance to the state, the defendant and the court. It is the duty of all concerned to investigate those views thoroughly in order to assemble the most qualified jury." *State v. Antwine,* 743 S.W.2d 51, 60 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). In *State v. McMillin,* 783 S.W.2d 82 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990), this Court stated unequivocally, "Death qualification *voir dire* necessarily requires 'deep probing as to opinions held,' including exploration of whether the venirepersons can consider the full range of punishment under the facts alleged in the case before them." *Id.* at 91 (quoting *State v. Leisure,* 749 S.W.2d 366, 373 (Mo. banc 1988)).

The United States Supreme Court has provided further guidance in determining when a death-qualification *voir dire* is sufficiently thorough so as to allow a defendant to identify potential jurors biased about the death penalty. In *Wainwright,* the Court noted the elementary proposition that "it is the adversary seeking exclusion who must demonstrate, *through questioning,* that the potential juror lacks impartiality." *Wainwright,* 469 U.S. at 423, 105 S.Ct. at 851–52 (emphasis added). In discussing the manner in which such questioning can reveal juror bias, the Court stated that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* at 424, 105 S.Ct. at 852.

The Court expounded upon the adequacy of *voir dire* in *Morgan v. Illinois,* 504 U.S. at 721–736, 112 S.Ct. at 2225–34. In *Morgan,* the Court determined that general fairness and "follow the law" questions were insufficient to satisfy the defendant's right to an adequate *voir dire. Id.* at 734–36, 112 S.Ct. at 2232–34. The Court explained that its cases establishing a right to an impartial jury "would be in large measure superfluous were this Court convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734–35, 112 S.Ct. at 2232–33. Because the Court found that "[i]t may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so," it concluded that the defendant should have been allowed to ask an additional question of the venire probing the specific concern of whether a venirepersons' views about the death penalty would prevent or substantially impair their ability to follow the court's death penalty instructions. *Id.* at 735–36, 112 S.Ct. at 2232–34. The trial court's refusal to allow such a question led the Court to reverse the sentence of death. *Id.* at 739, 112 S.Ct. at 2235.

The *voir dire* in the present case consisted entirely of one set of ten questions asked by the judge with no participation by the attorneys. Not one question was asked directly about the venirepersons' views about capital punishment and how those views might affect their ability to follow the law. Even in the abstract nature of the questions posed, venirepersons were asked only whether they would vote for the death penalty *automatically* and whether they would consider life without parole. No juror was asked whether the juror's ability to consider or vote for life without parole would be *substantially impaired.* Finally, and perhaps most significantly in view of the limited questions asked, no follow-up questions were allowed.

It is evident that because of the limited *voir dire* conducted, the failure to allow any follow-up questions prevented appellant from adequately identifying jurors whose views about the death penalty would prevent or

substantially impair their ability to consider life without parole. The questioning was conducted in the manner of a catechism, a type of questioning specifically said to be inadequate by the United States Supreme Court. *See Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852. The venirepersons were asked whether they could follow the law, but they were never asked whether they could do so *considering their views about the death penalty.* As in *Morgan,* therefore, the *voir dire* left unprobed the specific question of whether a potential juror's *views about the death penalty* would interfere with the juror's ability to follow the law. *See Morgan,* 504 U.S. at 735, 112 S.Ct. at 2233. Further, although the *voir dire* did touch upon the *Witherspoon* inquiry as to whether the potential jurors' views would cause them to vote for the death penalty *automatically,* the *voir dire* was devoid of the requisite *Wainwright* inquiry as to whether the venirepersons' views would *substantially impair* their ability to consider or impose life without parole.

In addition, the record shows that the nature of the *voir dire* stifled responses and created confusion. When a potential juror complained that the questions were confusing, no clarification or explanation was given. The confusion created by the *voir dire* is exemplified by the fact that at least fourteen venirepersons responded both that they would automatically vote for life without parole and that they would automatically vote for death. Considering these shortcomings in the questions posed to the venirepersons, allowing appellant to ask follow-up questions would have been necessary to provide him an opportunity to identify adequately those venirepersons biased about the death penalty.

Because the *voir dire* as a whole was insufficient to allow appellant the opportunity to identify adequately those venirepersons whose views about the death penalty would prevent or substantially impair their ability to follow the court's instructions regarding the death penalty, I would reverse the sentence of death and remand for a new penalty phase trial.