**STATE of Missouri, Respondent,**

v.

**Reuben Darnell OATES, Appellant.**

No. SC 81977.

Supreme Court of Missouri, En Banc.

Feb. 22, 2000.

Rehearing Denied March 21, 2000.

John R. Cullon, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for Respondent.

RONNIE L. WHITE, Judge.

Appellant, Reuben Darnell Oates, was convicted after a jury trial of one count of voluntary manslaughter and one count of armed criminal action. Oates was sentenced to nine years imprisonment for voluntary manslaughter and three years for armed criminal action, to be served concurrently. This Court granted transfer of the case under article V, section 10 of the Missouri Constitution and Rule 83.03. We affirm.

Oates and Tyrus Hopkins, the victim, worked together at the Service Oil Station at Troost and Armour Boulevard in Kansas City. While working at the service station on the night of September 5, 1996, the two men became embroiled in an argument. Mr. Nathaniel Brown, a witness who was walking by the station, testified that he saw Hopkins grab Oates and place him in a full-nelson hold.[1] He further testified that the deceased appeared to be attempting to drag Oates into the service station. Oates broke free, pulled a handgun out of his pants, and began firing at Hopkins, shooting him once in the chin. Hopkins ran into the service station with Oates pursuing him and shooting at him.

---

1. American Heritage Dictionary 538 (2d. ed.1991) (defining full-nelson as "a wrestling hold in which both hands are first thrust under the opponent's arms from behind and then pressed against the back of the opponent's neck").

Brown noticed a police cruiser driving by and flagged it down. Officer Briggs exited the cruiser just as Oates emerged from the service station still holding the handgun. Officer Briggs ordered Oates to drop his weapon and raise his hands in the air. Oates initially ignored Officer Briggs' order, but complied after Officer Briggs repeated the order several times. After placing Oates under arrest, Officer Briggs entered the service station and noticed Hopkins lying in a fetal position on the floor in a closet. An autopsy later revealed that Hopkins had been shot once in the chin and once in the back of his head.

During *voir dire*, Oates' attorney asked, "[w]ould anybody on the panel believe that the fact that the person is shot in the back of the head automatically would defeat a self-defense claim?" The prosecution objected on the grounds that it asked for a commitment from the venirepersons. Oates' attorney offered two alternative phrasings for the question. First, he asked if anyone would be "unable to sit as a fair and impartial juror if they hear evidence that the deceased was shot in the back of the head." Alternatively, he suggested that he be permitted to ask, "[i]f the evidence comes in that there's a shot in the back of the head, can you still follow the self-defense instruction?" The trial court sustained objections against the question in all of these forms.

In his testimony at trial, Oates recounted the events before the shooting. He stated that he and Hopkins began arguing when neither man was willing to make change for a customer trying to pay for $10.00 worth of gasoline with a $100.00 bill. As the two men argued, the customer drove off without paying. Realizing that a $10 shortage in the receipts for the service station would result, Oates claims that Hopkins threatened him saying, "[i]f we come up short, I'm going to hurt you, I'm going to do something bad to you, I'm going to kill you." Oates testified that after the argument ended, Hopkins tackled him unexpectedly from his blind side as he sat on one of the concrete islands. When Oates finally escaped Hopkins grasp, Hopkins tried to hit Oates with his fist and again told him that he was going to kill him. Oates ducked the blow and Hopkins hit a wooden cigarette box on one of the concrete islands. As Hopkins again moved towards Oates, Oates pulled out his handgun and threatened to shoot Hopkins should it be necessary to protect his life. When Hopkins continued towards him, Oates shot Hopkins in the chin. Hopkins ran into the service station. Knowing that Hopkins kept a handgun in the desk drawer of the service station, Oates testified that he followed Hopkins into the service station and shot him in the back of the head as he was reaching in the drawer for the handgun.

## I.

A defendant is entitled to a fair and impartial jury.[2] A necessary component of a guarantee for an impartial jury is an adequate *voir dire* that identifies unqualified jurors.[3] However, the trial judge is vested with the discretion to judge the appropriateness of specific questions,[4] and is generally vested with wide discretion in the conduct of *voir dire*.[5] The judge is in the best position to determine "whether a disclosure of facts on *voir dire* sufficiently

---

2. U.S. Const. amends. VI, XIV; Mo. Const. art. I, sec. 18(a).

3. *Morgan v. Illinois*, 504 U.S. 719, 729–30, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (holding that "[w]ithout an adequate *voir dire* the trial judge's responsibility to remove the prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled").

4. *State v. Clark*, 981 S.W.2d 143, 146 (Mo. banc 1998) (*quoting State v. Smith*, 649 S.W.2d 417, 428 (Mo. banc 1983) for the proposition that the trial judge "supervises *voir dire* and 'and the nature and extent of the questions counsel may ask are discretionary with that court' ").

5. *State v. Nicklasson*, 967 S.W.2d 596, 608 (Mo. banc 1998).

assures the defendant of an impartial jury without at the same time amounting to a prejudicial presentation of the evidence."[6] Rulings by the trial court are reviewed only for an abuse of discretion.[7] An appellate court will find reversible error only where an abuse of discretion is found and the defendant can demonstrate prejudice.[8] Where an appellant claims that a trial court abused its discretion in conducting the *voir dire*, he has the burden of showing a "real probability" that he was prejudiced by the abuse.[9]

■■■■ Oates first argues that the trial court erred when it disallowed questions to the venire panel during *voir dire* regarding whether they could consider his self-defense claim if the evidence showed the victim was shot in the back of the head. As mere general fairness questions are rarely sufficient to shed light on possible preconceived prejudices,[10] it is important to permit a defendant to reveal critical facts in order to protect his right to search the venire panel for possible prejudice or bias. However, not every fact should be disclosed to the venire.[11] Only critical facts, those facts with a substantial potential for disqualifying bias, need be revealed.[12]

Oates contends that the shot in the back of the head constitutes a critical fact that should have been submitted to the venire panel. In support of his assertion, Oates points to *State v. Clark*[13] for support regarding what constitutes a critical fact. In *Clark*, the defendant sought to ask the venire panel if they could fairly and objectively decide a case where one of the murder victims was three years old. The State filed a motion in limine, asking the court to prohibit the defense counsel from "seeking a commitment" from the venire by informing them of specific facts in the case. The trial court sustained the motion and ruled that the defendant was not entitled to *voir dire* on the specifics of the case. This Court determined that the trial court improperly limited the scope of *voir dire* and reversed the conviction. We determined that the age of the victim in *Clark* created a substantial potential for disqualifying bias that must be disclosed to the venire panel in the search for bias and partiality.[14]

The facts of this case are distinguishable from *Clark*. The critical fact in *Clark* involved the brutal murder of a very young child. There exists a prevalent perception among society that the killing of an innocent child is never justified, regardless of any extenuating circumstances. It is by virtue of this common perception that the circumstances of the murder in *Clark* constitute a critical fact that necessitates allowing the defense to probe the venire panel during *voir dire*. In contrast, being shot in the back of the head, while certainly a difficult fact for the defense to refute, does not rise to the level of a critical fact. Had the jury believed Oates' testimony that Hopkins was reaching into the drawer for a weapon with his back to Oates, a jury could determine that Oates was still in

---

6. *State v. Leisure*, 749 S.W.2d 366, 373 (Mo. banc 1988).

7. *Clark*, 981 S.W.2d at 146.

8. *State v. Womack*, 967 S.W.2d 300, 302–03 (Mo.App.1998).

9. *State v. Nicklasson*, 967 S.W.2d 596, 608 (Mo. banc 1998).

10. *Id.* at 611 (citing *Morgan*, 504 U.S. at 733, 112 S.Ct. 2222.)

11. *Clark*, 981 S.W.2d at 147.

12. *Id.*

13. 981 S.W.2d 143 (Mo. banc 1998)

14. During his closing argument, the prosecutor in *Clark* emphasized the age of the victim. For example, in his guilt phase opening statement, he repeated the age of the victim some three times and referred to her as a "baby" eight times. He concluded his guilt phase closing argument saying, "That's the man we're dealing with here, that's what we got here, that's who's sitting right here. A guy can walk up to a baby and put a bullet into her head."

danger of serious harm or even death, despite the fatal shot to the back of head. Such circumstances might justify Oates' actions in the mind of a reasonable juror.

While the circumstances surrounding this case pose substantial obstacles to the defense, the obstacles do not stem from any preconceived bias among the venire. This case included undisputed evidence that the accused shot his unarmed victim once, followed the wounded victim inside the service station with a firearm, and then shot him again in the back of the head. There is also evidence that the victim was found lying in a fetal position on the floor in a closet. Should this Court determine that the circumstances surrounding Hopkins' murder constitute a critical fact, then nearly any fact that strongly weighs against a defendant would pass muster. We find that the circumstances of the killing in this case do not constitute a critical fact.

## II.

 In his second point, Oates claims that the trial court erred when it prohibited his attorney from telling the jury during closing argument that "you can pursue your assailant until you secure yourself from danger." Oates contends that the trial court's decision misled the jury on the law of self-defense and thwarted his ability to make his self-defense claim to the jury.

 It is improper for counsel to inform the jury as to the substantive law of the case, to read statutes to the jury, or to argue questions of law inconsistent with the jury instructions.[15] The trial court has broad discretion in determining the scope of the arguments before it,[16] and its rulings on oral argument matters will not be overturned absent a showing of an abuse of discretion.[17]

Oates argues that the trial court's decision to sustain objection against his statements during closing argument conflicts with this Court's decision in *State v. Gadwood*.[18] He contends that *Gadwood* stands for the proposition that a defendant "may pursue his assailant until he has secured himself from danger."[19] Such a reading of *Gadwood* is misplaced. *Gadwood* involves the issue of withdrawal and restoration of the right of self-defense after the defendant had initiated an altercation. This Court held that "when a defendant attempts to justify a homicide on the ground that he had withdrawn from the altercation [that he initiated] and thereby revived his right to self-defense," the defendant must offer "substantial evidence showing an abandonment of the struggle by the defendant operating as a clear announcement of his desire for peace."[20] *Gadwood* further requires that the defendant's adversary must know of the defendant's abandonment and announcement for peace.

Unless all of these aforementioned conditions have been met, the Court in *Gadwood* recognized that the victim can pursue his attacker without the attacker regaining a right to self-defense. As the facts of this case do not involve the issue of withdrawal, *Gadwood* is not on point.

## III.

 In his third point, Oates contends that the trial court erred when it allowed the State to cross-examine Oates regarding his commission of prior acts of violence. During his direct examination, the defense asked Oates whether he had ever seen Hopkins commit a violent act. Oates then described an instance involving Hopkins jumping into a car window to attack a fellow co-worker when a cash shortage was found in the receipts for the service sta-

---

**15.** *State v. Jordan*, 646 S.W.2d 747, 751 (Mo. banc 1983).

**16.** *Nicklasson*, 967 S.W.2d at 615.

**17.** *Id.*

**18.** 342 Mo. 466, 116 S.W.2d 42 (1938).

**19.** *Id.* at 57.

**20.** *Id.*

tion. Following this testimony, the trial court found that the defense had injected the issue of character into the case and permitted the State to cross-examine Oates regarding four prior assaults that he committed that did not result in conviction. Oates claims that these acts are unrelated to the second-degree murder and armed criminal action charges he faced at trial and that the introduction of the evidence would be more prejudicial than probative as to his guilt on these counts.

 The trial court must be permitted broad discretion in deciding the permissible scope of cross-examination, and an appellate court will not reverse a criminal conviction unless it finds that the trial court abused its discretion.[21] Furthermore, the scope of cross-examination and the determination of matters of witness credibility are largely within the discretion of the trial court.

 Oates was asked on direct examination whether he had ever previously seen Hopkins commit an act of violence. He responded affirmatively and recounted an incident where Hopkins chased a man, jumped into his car, and committed an act of battery. Generally speaking, the bad character of an accused is not suitable for inquiry unless he tenders an issue involving his character.[22] Relying on *State v. Schlup*,[23] the trial court determined that Oates had intentionally injected the issue of Hopkins' violent nature into the case. By so doing, he opened himself up for inquiry into his own actions that might bring his own violent nature into ques-

tion.[24] While Oates' attack on Hopkins' credibility obviously does not serve to discredit Hopkins as a witness in the case, it does lend credibility to Oates' self-defense claim by making an inference that Hopkins was the first aggressor.[25] Because Oates offered direct evidence of Hopkins' bad acts to support his self-defense theory, he cannot now complain that his character was subjected to the same scrutiny.

## IV.

 In his final assertion of error, Oates contends that the trial court erred when it asked the jury whether it could agree on the level of punishment for Oates before asking the jury whether it had found Oates guilty or not guilty. The court had just received a note from the jury asking whether the court could impose a sentence if the jury were to render a verdict. The court asked the jury whether it had reached its decision on Counts I and II finding the defendant either guilty or not guilty. The foreperson replied affirmatively on both counts. The court then asked whether the jury "believe[d] that agreement on the question of punishment as to Count I can be reached if the jury [were] given more time to deliberate." The foreperson responded negatively. The foreperson gave the same response with regard to Count II. At this point, the defense asked for a mistrial, noting that the court had presupposed the defendant's guilt by failing to ask the jurors whether they had found the defendant guilty or not guilty. The court denied the

---

21. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995); *see also State v. Suter*, 931 S.W.2d 856, 865 (Mo.App.1996); *State v. Jackson*, 925 S.W.2d 856, 864 (Mo.App.1996).

22. *State v. Robinson*, 344 Mo. 1094, 130 S.W.2d 530, 531 (1939).

23. *State v. Schlup*, 785 S.W.2d 796 (Mo.App. 1990).

24. *Id.* at 801 (quoting *State v. Robinson*, 130 S.W.2d at 531, for the proposition that "[w]here an accused tenders the factual issue of bad character of the victim to substantiate

his plea of self-defense, he thereby extends the scope of the inquiry beyond the *res gestae* and opens up for inquiry all evidence of like quality having probative value on the merits of said factual issue.")

25. *See State v. Robinson*, 130 S.W.2d at 531 (noting that the likely purpose of Robinson's introduction of the bad character of the deceased "was to evidence the probability as to who was the aggressor and to substantiate appellant's plea of self-defense.")

motion and asked the foreman what the jury had concluded regarding the defendant's possible guilt. The foreperson responded that the jury had found the defendant guilty on both counts.

Oates contends that this very issue was decided in *State v. Richardson.*[26] After two days of deliberations, the jury in *Richardson* advised the court in writing that it was "unable to reach a verdict; vote is 10 to 2."[27] The court then asked whether the jury might be able to reach a verdict if the issue of punishment were removed from the jury's consideration. The foreperson responded affirmatively. The jury in *Richardson* then returned guilty verdicts on both counts charged.[28] The court of appeals reversed the conviction because it found that the trial court had, in effect, instructed the jury that it could move straight to the punishment phase without first determining that the jury had found the defendant guilty.

*Richardson* is distinguishable from the present case. In *Richardson,* the jury expressly told the trial court that it was unable to reach a verdict. In this case, the jury first told the court that it had already reached its verdict. The jury then inquired on its own whether the court could impose a sentence where its verdict had already been reached. By (1) informing the court that it had reached a verdict and (2) asking whether the court could impose a sentence where its verdict had been reached, the jury made it clear that it had reached a guilty verdict. Furthermore, when the court recognized its error and asked the foreperson whether the jury found the defendant guilty or not guilty, the foreperson unequivocally stated that the jury had found him guilty. As the verdicts had already been reached, it is clear that the court's question could not have tainted the minds of the jurors.

For the foregoing reasons, the judgment of the trial court is affirmed.

All concur.

26. 951 S.W.2d 718 (Mo.App.1997).

27. *Id* at 719–20.

28. *Id* at 720.