

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI,

                    **Respondent,**

v.

BRANDON B. HOWELL,

                    **Appellant.**

**WD82846**

**OPINION FILED:**

**April 13, 2021**

Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Joel P. Fahnestock, Judge

Before Division One:
Alok Ahuja, P.J., Thomas H. Newton, and Thomas N. Chapman, JJ.

Following a jury trial in the Circuit Court of Jackson County, Brandon Howell ("Howell") was convicted of five counts of first-degree murder, four counts of armed criminal action, one count of first-degree burglary, and one count of stealing. Howell raises four points on appeal. Howell contends that the trial court erred in: (1) excluding counsel from observing the initial juror qualification; (2) overruling Howell's motion to use venirepersons' names instead of numbers in *voir dire*; (3) failing to grant Howell's motion for judicial recusal; and (4) admitting testimony regarding the likelihood that blood spatters found on Howell's clothing matched that of victims in this case. Finding no error, we affirm.

**Factual and Procedural Background**[1]

George and Anna Taylor lived in a duplex in a cul-de-sac at 1 Woodbridge Lane. The Taylors owned a tan Toyota Highlander SUV. Around 12:50 p.m. on September 2, 2014, a 911 call was made from a female caller who (before the call was disconnected) reported a party with a shotgun at 1 Woodbridge Lane.

Around 1:00 p.m., Billie Simler, who lived at 111 Woodbridge Lane, was watching television when he heard "two loud noises, bam, bam, like that." Simler looked out to the cul-de-sac and saw a tan Toyota Highlander SUV turning around in the cul-de-sac. At that point, Simler heard a third bang.

Around 12:54 p.m., two officers with the Kansas City Police Department ("KCPD") were dispatched to 1 Woodbridge Lane, arriving around 1:05 p.m. The officers discovered a body lying in the driveway at 3 Woodbridge Lane. The victim, Susan Choucron, was deceased from a shotgun wound to the face.

Subsequently, a search was conducted of the residence at 1 Woodbridge Lane. In the basement, George and Anna Taylor were found, not moving and with grave injuries. George Taylor had suffered a fractured skull, several abrasions and hematomas to his face, and his ribcage had broken away from his chest wall. He suffered from agonal respirations, which signaled that he was close to death. Anna Taylor had an apparent puncture wound on the back of her head and abrasions on her cheek and nose. George and Anna Taylor were transported to separate hospitals. Both ultimately died of blunt force trauma injuries. Numerous blood stains

---

[1] Howell does not challenge the sufficiency of the evidence to support his convictions. "The evidence is viewed in the light most favorable to the verdict." *State v. Anglin*, 45 S.W.3d 470, 471 (Mo. App. W.D. 2001).

2

were found in the basement. A purse and a wallet were found on a table at 1 Woodbridge Lane, neither of which contained any cash.

The bodies of Alice and Darrel Hurst were found in the driveway of 7 Woodbridge Lane. Alice Hurst had died of a shotgun wound to the face. Darrel Hurst had died from a shotgun wound to the chest. A red shotgun shell was found in the driveway.

A dispatch was put out for the beige-colored Toyota Highlander that had belonged to Anna and George Taylor. The vehicle was found around 4:00 p.m. in North Kansas City, backed into a restaurant parking space.

Later that evening, Howell was arrested about seven or eight blocks away from where the Highlander was recovered. While Officer James Muhlbauer was on patrol, he received a dispatch that a motorist reported seeing a possible homicide suspect walking southbound on Interstate 29. Following the dispatch, Muhlbauer spotted a suspect, later identified as Howell, walking down the breakdown lane of the interstate and "cupping" his right pant leg as if he was holding something inside. Concerned Howell was the homicide suspect, Muhlbauer stopped Howell. When Howell was asked to kneel, he bent his left knee but kept his right leg out to the side, claiming he had leg cramps. When Muhlbauer frisked Howell, he found a 12-gauge shotgun barrel and magazine tube inside Howell's pant leg, at which point Muhlbauer placed Howell in handcuffs.

Following Howell's arrest, a search of Howell revealed two 12-gauge shotgun shell casings and a set of keys. The following items were also seized from Howell's possession: a pair of Adidas athletic shoes, a dark green Carhartt brand jacket, a pair of blue pants, a ski mask, a pair of gloves, two towel strips, and $269.25 in cash.

3

The two shotgun shell casings recovered from Howell were fired from the same shotgun as the shell that was recovered in the driveway at 7 Woodbridge Lane, where the bodies of Alice and Darrel Hurst were found. All three shell casings were fired from the shotgun Howell was carrying when he was arrested.

One of the keys in Howell's possession unlocked the door of the Toyota Highlander that belonged to George and Anna Taylor. The sole of Howell's right shoe matched a shoe print found in the garage at 1 Woodbridge Lane. Clothing fibers similar to Howell's clothing were found in the Toyota Highlander.

Blood on the driver's side floorboard of the Toyota Highlander matched Susan Choucron's DNA profile. George Taylor was a possible contributor of DNA to a blood stain on the back of Howell's ski mask. Susan Choucron was a possible contributor of DNA to the t-shirt Howell was wearing. George Taylor was a likely contributor of DNA found on Howell's shoes. Susan Choucron's DNA profile was found in a stain on the front of Howell's jacket.

Howell was charged as a prior offender by amended information in lieu of indictment with five counts of first-degree murder, four counts of armed criminal action, one count of first-degree burglary, and one count of stealing. The jury found Howell guilty on each of these charges. Howell was sentenced to life imprisonment without the possibility of parole on the murder counts; life imprisonment on the armed criminal action counts; ten years' imprisonment on the burglary count; and one year for stealing. Howell now appeals to this court.[2]

---

[2] Additional facts relevant to the points Howell raises on appeal are provided in our analysis of those points.

**Analysis**

Howell raises four points on appeal. Howell contends that the trial court erred in: (1) excluding counsel from observing the initial juror qualification; (2) overruling Howell's motion to use venirepersons' names instead of numbers in *voir dire*; (3) failing to grant Howell's motion for judicial recusal; and (4) admitting testimony regarding the likelihood that blood spatters found on Howell's clothing matched that of victims in this case.

**Point One**

In his first point on appeal, Howell asserts that the trial court abused its discretion in denying defense counsel's request to be present for juror qualification because observing the venirepersons and their responses to the trial court was necessary for counsel to properly exercise for-cause and preemptory strikes.

The *voir dire* process in this matter was initially planned with the understanding that the State would be seeking the death penalty. With that understanding, a pretrial conference was held in which the parties provided input on the content of a questionnaire that would be given to potential jurors at a preliminary qualification of said jurors. The apparent purpose of this questionnaire was to eliminate prospective jurors with no real potential of being seated prior to the general *voir dire* due to concerns regarding seating a full panel of death-qualified jurors and the possibility that potential jurors may have been exposed to pretrial publicity. The trial court explained that the prospective jurors would complete the questionnaire at the qualification and that the trial court would discuss statutory qualification issues, such as whether the panel could read, write, and understand English, with the prospective jurors. The trial court also indicated that it would be available to discuss hardship issues with potential jurors at the initial qualification. The trial court indicated that the attorneys would not participate in the preliminary

5

qualification. After the initial qualification, the completed questionnaires would be provided to the attorneys who would have the opportunity to provide the court with agreed-upon strikes based on the questionnaire. The parties would then engage in small group *voir dire* that would result in a death-qualified panel. A traditional *voir dire* would then take place at the beginning of trial.

During the hearing, Defense counsel requested to have a representative present at the qualification to observe the court's preliminary questioning of the panel. Counsel did not wish to participate or be identified, but wished to have someone sit in the courtroom and quietly take notes. The trial court told counsel that it would consider that request, which was ultimately denied.

After the State waived the death penalty, a hearing was held regarding how the waiver would affect jury selection and how the questionnaire would be updated, with Howell having submitted an updated questionnaire. The State argued that the questionnaire was no longer necessary and stated its preference that jury selection simply be done the more traditional way. Howell argued that the use of the questionnaire would help the parties and the court ferret out problems with pretrial publicity. The trial court decided to go forward with using the questionnaire in the initial qualification, believing it to be a time-saving measure.

At a subsequent pretrial conference, the trial court explained how jury selection would be conducted:

> Voir dire. As you know, I will be doing the hardships this week. Here's how this is going to go. The jury room is pulling in around 170 tomorrow. They will show up, they will fill out questionnaires at that time. I will meet with anybody, any juror who wants to meet with me to discuss hardship issues and qualification issues only.
>
> Once that is done, we will submit the questionnaires to you all. Any agreed-upon strikes, we will strike. We talked about having a day where we have them in to

6

discuss publicity issues only if you all cannot agree on those, which is fine. After we go through that process, we will submit the final list to the jury room and they will randomly pull 80 for our voir dire on Monday, April 8th.

On Thursday of this week, we're going to do the exact same process, to get a separate panel of 80 in the exact same fashion that we will have on standby for Tuesday, April 9th, in case something would happen on Monday. So they will be two separate panels, no recycled folks as of – we'll just have a backup.

And so the normal jury process that we always do every time will still be in effect, we're just pulling in a special panel for this case.

After the initial qualification, counsel for the State and Howell provided the trial court with a list of agreed upon strikes based on the questionnaires submitted by the potential jurors. The trial court held a hearing in which jurors were struck by agreement of the parties based on the questionnaire responses. The trial court also considered arguments by Howell and the State regarding strikes that were not agreed to by the parties. Prior to the general *voir dire*, the trial court provided the parties with an opportunity to question individual jurors based upon responses to questions on the questionnaire regarding pre-trial publicity. A general *voir dire* was then conducted on a panel of 82 prospective jurors who were sworn in and questioned by the State and Howell.[3] At the end of this process, a petit jury was selected.

 "A defendant is entitled to a fair and impartial jury." *State v. Oates*, 12 S.W.3d 307, 310 (Mo. banc 2000). "A necessary component of a guarantee for an impartial jury is an adequate *voir dire* that identifies unqualified jurors." *Id.* A trial judge "is generally vested with wide discretion in the conduct of *voir dire*." *Id.* We review the trial court's rulings regarding the conduct of *voir dire* for an abuse of discretion. *State v. Baumruk*, 280 S.W.3d 600, 614 (Mo. banc 2009). "An appellate court will find reversible error only where an abuse of discretion is

---

[3] From the jury list in our record, it appears that the general venire was comprised of 85 prospective jurors, 82 of whom were actually present at the *voir dire*.

7

found and the defendant can demonstrate prejudice." *Oates*, 12 S.W.3d at 311. "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006). "Where reasonable persons can differ about the propriety of the action taken by the trial court, no abuse of discretion will be found." *Id.* "The defendant bears the burden of showing that there is a 'real probability' that he was prejudiced by the abuse of discretion." *Id.*

As an initial matter, although Howell characterizes the court's initial juror qualification as part of *voir dire*, his claim of error ultimately relates to the trial court's actions prior to the selection of the general venire panel. Howell argues that he was prejudiced by the exclusion of his counsel from the initial juror qualification, because the observation of the venirepersons in responding to questions regarding statutory qualifications was necessary for his counsel to properly exercise for-cause and peremptory strikes at the conclusion of the general *voir dire*. It is not clear from the record precisely what questions were asked of the prospective jurors at the initial qualification, though the record indicates that these questions were to relate to statutory qualification issues and hardships only. Our record does not contain the contents of the questionnaire that was filled out by prospective jurors. Our record likewise contains no information regarding what jurors, if any, were excluded at the initial qualification, or why they may have been excluded.

Chapter 494 of the Revised Statutes of Missouri provides a number of statutory jury selection requirements, including that certain categories of persons shall be disqualified from serving as a petit or grand juror, *see generally* section 494.425; and that certain categories of persons shall be excused from service upon timely application to the court, *see generally* section

8

494.430.[4]  Section 494.430.2 provides that a judge of the court for which the individual was called to jury service "shall make undue or extreme physical hardship determinations."

Howell cites to no legal authority that guarantees him the right to have counsel observe the process of qualifying the general venire with respect to statutory disqualifications and statutory hardship excusals that take place prior to the selection of the general venire. These matters are regularly conducted through written correspondence with the trial court, which would not allow a party the ability to observe prospective jurors respond to such questions. *See e.g. State v. Anderson*, 79 S.W.3d 420, 431 (Mo. banc 2002) (finding no substantial failure to comply with the jury selection statutes when hardship determinations were made through written correspondence);[5] *see also* Jackson County Circuit Court Rule 52.1.1 (providing that prospective jurors are to fill out informational questionnaires online).

Howell does not argue that any statutory requirements or court rules were violated in the selection of the general venire panel, and in any case, section 494.465 provides the exclusive procedure "by which a party may challenge a jury on the ground that the jury was not selected in conformity with statutory jury selection procedures." § 494.465.3. Section 494.465.1 provides that a party may move to stay the proceedings or for other appropriate relief if a substantial failure to comply with the statutory jury selection procedures occurred; however, such motion must be made prior to the time when the petit jury is sworn or within fourteen days after the party could have discovered the grounds supporting the motion. Howell took no steps to challenge the selection of the general venire panel prior to the swearing in of the petit jury.

---

[4] Unless otherwise indicated, all statutory references are to RSMo 2016, as supplemented.

[5] The jury selection statutes contained in Chapter 494 have changed significantly since *Anderson*.

9

With respect to whether the trial court abused its discretion in excluding Howell's counsel from the initial juror qualification, there is a paucity in the record regarding precisely what occurred, what information was reflected in the questionnaire, and what jurors, if any, were struck prior to the delivery of the completed questionnaires to the attorneys. However, it is unnecessary for us to speculate because, in order for us to find reversible error, Howell must demonstrate that he was prejudiced by the trial court's action. *Oates*, 12 S.W.3d at 311. Howell has not established such prejudice.

The only allegation of prejudice that Howell makes is that he would have had a greater opportunity to observe the venirepersons. However, Howell makes no specific allegations of prejudice but instead relies on the unsupported conclusion that such additional observation was necessary in order to make for-cause and peremptory strikes after the general *voir dire*. Howell makes no arguments that the general venire was not properly drawn. Howell does not assert that any juror that was seated was not fair and impartial. He does not allege that he was prejudiced by the improper exclusion of any potential juror or jurors during qualification. He likewise makes no arguments regarding what, if anything, might have been observed during qualification that could not have been observed at the general *voir dire*.

Although Howell is correct that he is entitled to an adequate *voir dire* to identify unqualified jurors, *Oates*, 12 S.W.3d at 310, the record indicates that his *voir dire* was adequate. The trial court exercised its discretion to allow Howell extensive opportunities to strike venirepersons based on disqualifying biases even before the general *voir dire*. In addition to the agreed-upon strikes resulting from the questionnaire, Howell was allowed to make arguments with respect to the prospective jurors' questionnaire responses, and the trial court considered strikes based on these arguments. Howell was allowed to question prospective jurors regarding

10

pretrial publicity prior to the general *voir dire*. Howell was given ample opportunity to question the general venire at the general *voir dire*. We find that Howell failed to make a timely effort to address his claimed flaw in the jury qualification process (such as seeking a stay as provided under section 494.465.1 were he making a statutory challenge); and further that he also failed to establish that he was prejudiced by the trial court's action.

Point one is denied.

## Point Two

In his second point on appeal, Howell asserts that the trial court abused its discretion in overruling defense counsel's motion to use the venirepersons' names instead of numbers because the jury would have interpreted the use of numbers as a protective measure, causing them to fear for their safety from Howell.

When the general *voir dire* began, the trial court explained to the panel of prospective jurors that the jurors' numbers would be used instead of their names for the purpose of keeping a clean record.

> As you see, you have been given these numbers. We are going to refer to you, sorry, by number only and that is to help [the court reporter] take a clear record. It is so much easier for her to do that if we just refer to you by number. So we're sorry if that's a little bit impersonal, but we have found that that makes our record better and clearer.

We find it was within the trial court's discretion to use numbers rather than names during *voir dire*. The record reveals that the reason for using the venirepersons' numbers instead of names was to create an efficient record, rather than to make any kind of signal relating to a danger posed by Howell. Moreover, when the selected jurors were seated for trial, they were seated by their names.

11

In support of his contention that using the potential jurors' numbers was an abuse of discretion, Howell cites to a case from the United States Court of Appeals for the Seventh Circuit, in which the use of anonymous jurors was found to be in error. *United States v. Mansoori*, 304 F.3d 635, 651 (7th Cir. 2002). However, *Mansoori* provides little support for Howell's contention because an anonymous jury was not used in his case. In this matter, the jury that was selected was not anonymous, but was seated by name. When selected jurors were announced, the trial court stated: "If I call your *name*, please come forward to be seated in the jury box, you have been selected as a juror in this case[.]" (emphasis added). The trial court then proceeded to read aloud and on the record the names of the selected jurors. Given these circumstances, the jury that was seated would not be led to believe that *voir dire* was conducted by their numbers as a measure to protect their identity, since the selected jurors' names were revealed at the end of the process. Rather, the jurors would reasonably believe that the trial court used numbers during the *voir dire* process for precisely the reasons the trial court explained – to aid the court reporter in making an efficient and accurate record. The trial court's decision was not "clearly against the logic of the circumstances and [] so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Johnson*, 207 S.W.3d at 40.

Point two is denied.

## Point Three

In his third point, Howell argues that the trial court abused its discretion in failing to grant his motion for judicial recusal which claimed that the judge's impartiality could be reasonably questioned, in that the judge had *ex parte* communications with jail personnel about

12

Howell and then, based on those communications, made its pretrial rulings requiring Howell to wear restraints.

At a pretrial hearing in the judge's chambers on January 5, 2015, the trial court reported to counsel that the jail guards reported to her that they were having difficulties dealing with Howell. These difficulties had required the guards to expend additional resources in transporting Howell to court. The trial court wanted to make counsel aware of this information. The trial court told counsel that it would continue to allow Howell to dress in civilian clothing and appear in court without handcuffs. However, the trial court told counsel that if Howell continued to cause problems with the jail guards, that it might reconsider that ruling.

At a pretrial hearing on October 24, 2016, the trial court informed counsel that it had received an email from the jail from the officer in charge of transporting inmates to the jail. The trial court then read the email to counsel which provided:

> Judge, I would like to inform you that inmate Brandon Howell has been found with shanks multiple times during shake down. I'm asking if you would reconsider the court order for Brandon Howell to not be in restraints during his court appearances. Mr. Howell is definitely a security and safety threat at this point in the process. Your consideration would be greatly appreciated on this issue.

The trial court then explained to counsel that it wanted to give counsel notice of the communication and that it had decided to change its prior order and would require Howell to appear in full restraints at future court appearances. Defense counsel stated its opposition to Howell not being brought to court with civilian clothes and noted that Howell would be treated differently based on allegations by a jail guard. The court responded:

> That's fine. Just so you're aware, he has been treated differently than any other defendant only in that he is the only one that ever dresses out and is not chained. Everyone else brought over here is. So, you know, that was a courtesy that was provided to him, which is very different than we normally handle folks who are in

13

court. And beyond that, when I entered that order, I let you all know that if something changed, I would give you notice of it and that my order would change.

And so that's kind of where I'm at. But that being said, I'm happy to hear from you further when we bring him over here.

On November 7, 2016, Howell filed a motion for judicial recusal arguing that the nonpublic manner in which the judge had addressed security concerns created an appearance of prejudice and impropriety. Howell sought recusal under Rule 2-2.11(A). The trial court denied this motion.

On March 26, 2019, the trial court indicated that it had received information that it needed to share with counsel. The trial court stated that it had received a call from Amber Ledbetter at population control, who informed the court that on the way back to the jail from the court the previous day, Mr. Howell had been scanned on x-ray. Jail personnel spotted what they believed to be a metal object in Howell's rectum. Howell was taken to a hospital for a CT scan and nothing was found. However, when the van that transported Howell was searched, a steel hook was found covered in fecal matter. The trial court stated:

> So as a result of that, I'm just requesting the jail to please scan him when he's coming from the jail to the courthouse and from the courthouse back to the jail and making that request. I'm also requesting that they keep him in restraints in elevators and in the hallways until he gets here to the courtroom.
>
> I have made arrangements with the jail that during trial, Mr. Howell be kept in the holding cell, as we previously discussed, until all the jurors are present up in the jury room and accounted for and we can keep them in the division and then have Mr. Howell walked to the courtroom.
>
> I will say again that while in the courtroom, I've never had any issues with Mr. Howell. And I've not had any concerns about safety and security. That being said, I do have an obligation to keep the courtroom safe for everybody including Mr. Howell. So I just want to be upfront with the defense team and Mr. Howell that if issues keep arising, I may well have to revisit the use of restraints or even ultimately his presence. My goal is to, of course, have him present and actively participating and not having restraints on in the courtroom. That's the goal.

14

And at this point, I don't see a need to change that. But I have enough concern that I am going to be monitoring the situation, I have asked the jail to please keep me informed. As always, whatever information I have, I will make a record of, make a record on and pass on to you all. So that's where we stand right now. Okay?

Howell then renewed his prior motion for recusal, arguing that it was inappropriate for the trial judge to have communications with jail personnel regarding Howell's behavior outside of the courtroom. Howell contended that such communications deprived him of the presumption of innocence and could influence the court in making a sentencing determination.

The court then stated:

Any communications I've had, I have, as soon as I'm able, I have brought to counsel. I don't regularly have discussions with the jail other than the discussions that I have disclosed.

This situation was brought to me because it's not about me monitoring Mr. Howell's behavior in the jail. It was brought to me because this piece of metal was a safety and security concern for the courtroom.

….

I have an obligation. There is no other way for us to proceed without having those types of discussions whether it's me, or another judge. Those discussions have happened, and they're going to happen. So me recusing, which I see absolutely no reason to do whatsoever, because as you know, part of our job as judges is to consider things when appropriate and disregard things when it is not appropriate to consider them, that is the nature of what we do.

If Mr. Howell is engaging in certain behaviors, he is making that choice to do so. And he does so and that causes these situations to happen. And when a defendant is making choices in creating a situation, he cannot use that situation and those choices to manipulate the process by getting a new judge or delaying the trial. That is not how this works.

At that point, the trial court denied Howell's renewed motion for recusal.

We review a trial court's denial of a motion for change of judge for an abuse of discretion. *State v. White*, 462 S.W.3d 915, 917 (Mo. App. W.D. 2015). "There is a

15

presumption that a judge acts with honesty and integrity and will not preside over a trial in which he or she cannot be impartial." *Worthington v. State*, 166 S.W.3d 566, 579 (Mo. banc 2005).

"Rule 2-2.11(A) sets the standard for when a judge should recuse in a proceeding." *Anderson v. State*, 402 S.W.3d 86, 91 (Mo. banc 2013). Rule 2.2-11(A) provides that a "judge shall recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned[.]" Recusal is required "when a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court." *Anderson*, 402 S.W.3d at 91 (internal quotations omitted).

> Whether a fact requires recusal depends on the factual context, which gives meaning to the kind of bias that requires disqualification of a judge. Specifically, a disqualifying bias or prejudice is one that has an extrajudicial source and results in an opinion on the merits on some basis other than what the judge learned from the judge's participation in a case. In cases requiring recusal, the common thread is either a fact from which prejudgment of some evidentiary issue in the case by the judge may be inferred or facts indicating the judge considered some evidence properly in the case for an illegitimate purpose.

*Id.* (quoting *Worthington*, 166 S.W.3d at 579).

In this matter, the factual basis that Howell asserts gave rise to the appearance of impropriety involved the trial judge's communications with jail personnel regarding security issues related to transporting Howell to and from the courtroom. The trial judge is responsible "for the conduct of the trial, the safety of all persons in the courtroom, and the prevention of escape." *State v. Endicott*, 881 S.W.2d 661, 663 (Mo. App. W.D. 1994). Here, the information the trial judge received related specifically to the judicial function of maintaining the security of the courtroom and the safety of the persons within it. In fulfilling that obligation, the trial judge expressed a willingness to hear information directly related to safety issues affecting the judge's courtroom. There is simply no indication in the record that the trial judge used the information

16

she received to prejudge a substantive or evidentiary issue at trial. Likewise, the fact that the judge received information relevant to the safety of persons in the courtroom does not reasonably give rise to the appearance of impropriety, as the judge had an obligation to ensure courtroom safety. Based on the record before us, it is unreasonable to find that the trial judge used these communications for any purpose other than to ensure the safety of all persons in the courtroom.

Although Howell asserts that the trial judge's communications with jail personnel were *ex parte* and characterizes these contacts as improper, he disregards the Supreme Court Rule governing *ex parte* communications. Rule 2-2.9 provides:

> (A) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter, except as follows:
>
> (1) When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided:
>
> (a) the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; and
>
> (b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond.

In this matter, the challenged communications between the trial judge and security/jail personnel related directly to matters affecting courtroom security. The trial judge is responsible for the conduct of the trial, the safety of all persons in the courtroom, and the prevention of escape. *Endicott*, 881 S.W.2d at 663. As the trial judge has an administrative obligation to ensure the security of persons in the courtroom, the trial judge is not per se prohibited from considering information that weighs directly on courtroom security (rather than the substantive matters of the case) when the circumstances require it, provided that the judge reasonably

17

believes that no party will gain an advantage as a result of the communication, and provided that the judge promptly notifies the parties of the substance of the communications and gives the parties an opportunity to respond. *See* Rule 2-2.9.

In this matter the trial judge followed the requirements of Rule 2-2.9. The challenged communications weighed directly on courtroom security – a matter that the judge was obligated to control. There is no indication from the record that the State received an advantage (or that the trial judge would reasonably believe that such an advantage was received) based on the trial judge's communications about security matters related to Howell. The trial judge also complied with the obligation to promptly notify the parties about the content of the information it had received related to security issues and provided the parties an opportunity to be heard regarding the communications.

There is no indication in the record that the trial judge harbored any bias or prejudice toward Howell. We likewise find no facts that would cause a reasonable person to find the appearance of impropriety. Rather, the record indicates that the trial judge approached this matter with the unwavering goal of ensuring Howell received a fair trial and the benefit of the presumption of innocence to which Howell was entitled.

Point three is denied.

### Point Four

In his fourth point on appeal, Howell argues that the trial court plainly erred in admitting testimony from DNA analyst Andrew Atkinson about likelihood ratios contained in a report from the Cyber Genetics lab. These reports contained information regarding the likelihood that DNA found on Howell's clothing matched that of victims in this case as opposed to an unrelated individual. Howell argues that the analyst's testimony used numbers many times greater than the

18

number of human beings on the planet; therefore, according to Howell, this testimony was more prejudicial than probative because the jury would have no way to place these numbers into context. Howell concedes that no objection to this testimony was made at trial and that the issue was not raised in Howell's motion for new trial. Thus, this allegation of error was not properly preserved for appeal. Howell requests that we review his fourth point for plain error.

> Generally, we review a trial court's admission of evidence for an abuse of discretion. Where there was no objection to the admission of the evidence, our review, if any, is for plain error only. Rule 30.20 authorizes this Court, in its discretion, to review plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.

*State v. McElroy*, 520 S.W.3d 493, 495 (Mo. App. W.D. 2017) (internal citations and quotations omitted).[6]

"Plain error review is waived when counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence." *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009) (internal quotations omitted). "Plain error review does not apply when a party affirmatively states that it has no objection to evidence an opposing party is attempting to introduce or for a trial strategy reason." *Id.* (internal quotations omitted).

In this matter, the record indicates that the parties had stipulated to the foundation and admission of the Cyber Genetics report. Neither the report nor the precise language of the stipulation appears in the record outside of references to the stipulation in the trial transcript. At a bench conference held outside of the hearing of the jury during the State's direct examination

---

[6] Although Howell requests that we review this allegation for plain error, his brief fails to delineate our standard of review for plain error or how that standard was met in this instance.

19

of Atkinson, Defense counsel attempted to reserve the right to argue that the Cyber Genetic

reports should not go back to the jury:

> [Defense Counsel]:  The Cyber Genetic reports, which are by stipulation, but we do reserve the right to raise if these reports go back to the jury.

Later, Defense counsel objected to the phrasing of a question the State asked Atkinson and the

following exchange occurred:

> [Defense Counsel]: It's a likelihood ratio, it is not the standard probability determination.
>
> [The State]:  You can ask him about that.
>
> [Defense Counsel]: The report is a likelihood ratio.
>
> [The State]: What's that?
>
> [Defense Counsel]: The report is a likelihood ratio, he read the report.
>
> [The State]: Right.
>
> [Defense Counsel]:  There's another way of saying it, which I think was scientifically accurate, that's my objection.  They testify as to between this –
>
> The Court:  I can't hear you.
>
> [Defense Counsel]:  Per the stipulation that the expert has read, the result and the terminology used by the laboratory that that's all this expert is expected to do.  He has sort of rephrased that back to the terminology that reflects the more traditional DNA type that was done at the lab, that's our objection.
>
> [The State]:  I'll just grab the stipulations.
>
> The Court:  Okay.
>
> [The State]:  All right.  Number 10, this is the stipulations for the record.  Defense stipulates the foundation and admission of the Cyber Genetics report to, I did it to [exhibit] 209, defense counsel also agrees Atkins had testified competently without objection as to the interpretation of the results.
>
> [Defense Counsel]: Let me add that he was deposed and asked about that.  He said I can testify as to their results, he's done that, it's competent, but what he's doing

now is forming the question of saying, it's phrasing it trying to show probability terms.

The Defense's objection to the phrasing of the question asked by the State was overruled. As relevant to Howell's point on appeal, it appears that Howell stipulated to the admissibility of the Cyber Genetics report, and specifically to testimony regarding the likelihood ratios contained in the report. Howell now argues that testimony regarding the likelihood ratios contained in the Cyber Genetics report was plainly inadmissible. However, that position appears to be contrary to the position affirmatively taken by counsel at trial. Although the Cyber Genetics report is not part of the record on appeal, the record does indicate that Howell's counsel affirmatively had no objection to Atkinson testifying to "the result and the terminology used by the laboratory" in creating the report, which apparently included the likelihood ratios contained in the report. We find that the failure to object to the admission of this evidence was not the result of inadvertence or neglect. Accordingly, plain error review of this point has been waived. *See Johnson*, 284 S.W.3d at 582.

Point four is denied.

## Conclusion

The judgment of the trial court is affirmed.

/s/ *Thomas N. Chapman*
Thomas N. Chapman, Judge

All concur.